**Simms T. NORMAND,**
**Plaintiff–Appellant,**

v.

**The RESEARCH INSTITUTE OF**
**AMERICA, INC.,**
**Defendant–Appellee.**

**No. 90–4328.**

United States Court of Appeals,
Fifth Circuit.

April 2, 1991.

Henry C. Walker, Walker, Tooke, Perlman, Lyons & Greer, Shreveport, La., Andrew C. Partee, Jr., Partee & Evans, New Orleans, La., for plaintiff-appellant.

A. Richard Gear, Cook, Yancey, King & Galloway, Shreveport, La., Eugene D. Ulterino, Nixon, Hargrave, Devans & Doyle, Rochester, N.Y., Abbie Reardon, Nixon, Hargrave, Devans & Doyle, New York City, for defendant-appellee.

Before POLITZ, WILLIAMS, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Plaintiff-appellant Simms T. Normand sued Research Institute of America, Inc., (RIA) for constructive discharge in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–34. The jury returned a special verdict finding that: RIA constructively discharged Normand; RIA discriminated against Normand because of his age; RIA's conduct was willful; and Normand mitigated his damages. RIA moved for judgment notwithstanding the verdict (j.n.o.v.) or, alternatively, for a new trial or remittitur. The district court, after exhaustively reviewing the evidence, held that the evidence did not support the jury's findings of discrimination, willful misconduct, or mitigation. On these issues, it granted RIA's motion for judgment n.o.v. We disagree with the district court—except on the issue of RIA's willfulness—and reinstate the relevant portion of the jury verdict on this over-prosecuted case.

By characterizing this case as "over-prosecuted," we intend no *ad hominem* criticism of appellant's counsel. ADEA cases must often be founded on circumstantial evidence of "old-age" animus, and it is understandable that counsel will adduce as much of the circumstances surrounding a plaintiff's termination as possible. If plaintiffs fail to discriminate between the truly probative circumstances and mere matters of innuendo or gossip, however, they run the risk of obtaining a flawed jury verdict. In this case, as will be seen, Normand relied upon at least one charge—age bias in RIA's territorial realignment—that had no evidentiary support. Normand's counsel should have recognized this fact before trial and not pursued it, although it is easy to see that the careful district judge could have been persuaded to let such "evidence" in. After this "evidence" led down a blind alley, the court was understandably concerned about its prejudicial effect on the jury verdict. We share that concern. We disagree with the district court's legal conclusion that there was insufficient evidence to support the jury verdict, but in another case we might be more reluctant to countermand an order for a new trial when a

plaintiff has burdened the record with evidence of business practices that do not reflect age discrimination.

## DISCUSSION

### A. Standard of Review.

The standard of review on appeal from a judgment n.o.v. is the same as that used by the district court. *Springborn v. American Comm. Barge Lines, Inc.*, 767 F.2d 89, 94 (5th Cir.1985). We review a judgment n.o.v. under the standard set forth in *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir.1969) (en banc):

> On motions ... for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the nonmover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla is insufficient to present a question for the jury. The motions for ... judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as a traditional finder of facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Id.* at 374–75 (citations omitted).

### B. Discrimination under the ADEA.

The elements of a Title VII case, as set forth in *McDonell–Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), apply to suits arising under the ADEA. *Bohrer v. Hanes Corp.*, 715 F.2d 213, 218 (5th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984) (citing *Reeves v. General Food Corp.*, 682 F.2d 515 (5th Cir.1982)). To establish a prima facie showing of age discrimination the plaintiff must demonstrate that: (1) he was a member of the protected class; (2) he was qualified to perform the job; (3) he was discharged; and (4) he was replaced by a person outside the protected class. *Id.* (citations omitted). A prima facie case creates a rebuttable presumption of intentional discrimination. *Laurence v. Chevron, U.S.A., Inc.*, 885 F.2d 280, 283 (5th Cir.1989) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981)). To rebut this presumption, the employer must articulate some legitimate, non-discriminatory reason for its action. *Id.* (citing *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094). An employer may sustain this burden by introducing admissible evidence of an explanation that would be "legally sufficient to justify a judgment for the defendant." *Bohrer*, 715 F.2d at 218 (quoting *Burdine*, 450 U.S. 248, 255, 101 S.Ct. 1089, 1094 (1981)). The employer need not persuade the court that its proffered reason actually motivated its decision, but the defendant's evidence must raise a "genuine issue of fact" as to whether it discriminated against the plaintiff. *Bohrer*, 715 F.2d at 218.

If the employer articulates legitimate, non-discriminatory reasons for its actions, the presumption created by the plaintiff's prima facie case dissolves and the burden reverts to the plaintiff to prove that the employer's reasons were pretextual. *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 646 (5th Cir.1985) (citing *Burdine*, 450 U.S. at 253–55, 101 S.Ct. at 1093–94). The plaintiff can establish pretext by introducing evidence to prove that the reason stated by the employer, "though facially adequate, was untrue as a matter of fact or was, although true, a mere cover or pretext" for illegal discrimination. *Elliott v. Group Medical & Surgi-*

*cal Servs.*, 714 F.2d 556, 566 (5th Cir.1983), *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984). The trier of fact may not disregard the defendant's explanation without countervailing evidence that it was not the real reason for the discharge. *Id.*

Both Normand's prima facie case of discrimination and RIA's articulated legitimate reasons for its employment decision, *i.e.*, Normand's poor sales performance, are conceded here. The parties vigorously dispute whether Normand introduced sufficient evidence to establish that RIA's explanation of its employment decision was a pretext for age discrimination. Persuaded by RIA, the district court held that "the plaintiff wholly failed to show RIA's decision to terminate him was pretextual, and that age was a determinative factor in any employment decision relating to the plaintiff." To determine whether a reasonable trier of fact could have concluded that age was a determinative factor in RIA's treatment of Normand, we must review the record in detail.

## C. Facts.

### 1. *Normand's Employment Record.*

▮ RIA, a subsidiary of the Lawyer's Cooperative Publishing Company, sells loose-leaf service publications for professionals, particularly tax specialists. Normand worked for RIA for nine years before being forced to resign. Four issues dominated the trial: whether RIA simply discharged Normand because of his poor sales performance; whether RIA altered sales territories nationwide to reduce the number of older sales representatives; whether Normand was treated worse than his thirty-one year old successor; and whether Normand's immediate superiors reflected an age bias that pervaded RIA. Each of these issues may be assessed in turn.

In 1977, RIA hired Normand, then fifty years old, as its exclusive sales representative in the Shreveport, Louisiana territory. With marked success, he increased the sub-

scription sales in his territory from eighty-seven quota products in 1977 to 450 quota products in 1980. RIA recognized Normand's achievement by making him a member of the "$100,000 Club" and the "President's Board," and he won a trip to Puerto Villarta in 1979. In 1980, Normand was promoted to regional manager, was named top manager in the nation, and was awarded an Alaskan cruise for his performance. Voluntarily returning to field sales in 1983, he again experienced success. In 1984, he was commended for "carrying the entire region" and earned $67,742 in commissions. In 1985, Normand led the south central region with $45,304 in commissions, which exceeded the national average. In 1986, Normand earned $31,468 in commissions, ranking fourth in his nine salesperson region.[1]

Normand's sales performance began to decline in 1985. In October, regional manager Bob Hale sent a memorandum to Normand requesting that he increase his sales calls from eleven and one-half to twenty per week, as required by the RIA territory management procedures. By December, however, Normand's weekly sales calls had declined. In response to Hale's memorandum requesting that he increase his sales calls per week, Normand explained that "saturation calls" were ineffective in his territory. Hale became concerned by Normand's failure to make appointments with clients before a sales presentation, and sent several memoranda to Normand in 1985 and 1986 requesting him to correct his scheduling. Hale also noted that Normand's sales presentations were becoming less effective. Throughout Normand's last year of employment with RIA, Hale sent a series of memoranda criticizing Normand's performance. Hale testified, and demonstrated through memoranda sent to other employees, that the tone of his memoranda to Normand was the same as the tone of his memoranda to other employees who were not producing. Further, Normand admitted that while he was a regional manager, he wrote similar memoranda to his

---

1. The RIA compensation year runs from July through June, thus Normand's 1986 commission earnings are based on sales from July 1985 through June 1986.

sales representatives prodding them to increase sales. In July, 1986, Hale sent Normand a memorandum diagnosing him as a case of "classic salesmen's burnout syndrome." Despite these memoranda denigrating Normand's sales performance, Hale testified at trial that he considered Normand's sales production to be satisfactory.

The record reflects Normand's 1986 record of new sales as follows: In March, Normand made two sales; in April, May and June no sales; in July, five sales; in August, no sales; and in the two weeks of September during which Normand remained at RIA, he made no sales. For six weeks before Normand's termination, he made no sales. According to Normand's weekly call reports from April 22, 1986, through August 26, 1986, he missed seven workdays because of an arm infection. At trial, RIA argued that Normand's health problems prevented him from fulfilling the duties of his position. Normand countered that his arm did not pose any significant problems.

RIA challenged Normand's willingness to follow company rules and etiquette. Although attendance at national sales meetings was mandatory, Normand did not attend the 1985 national sales meeting because of a leg injury. The real estate coordinator, a new RIA product, was launched at this meeting. Hale scheduled a meeting with Normand at the Shreveport Airport to inform Normand of the events at the national sales meeting, but Normand's car broke down in Bunkie, Louisiana, and he missed this meeting. Worse than that, he attempted to telephone Hale at the airport to cancel the meeting, but could not reach him. When this meeting was rescheduled, Normand requested an alternative day because a family crisis required his attention. Normand and Hale eventually met the following week to discuss the national meeting. Hale sent Normand a memorandum, at division manager Billie Dorgan's direction, stating that Normand's failure to attend the 1986 national sales meeting, without a verifiable doctor's certificate, would be considered a resignation.

On September 10, 1986, Normand and Hale met to evaluate Normand's performance and status with RIA. Hale offered Normand three options: (1) develop a new sales plan; (2) accept disability leave; or (3) retire. Hale stated again that Normand was suffering from "the old salesman burnout syndrome." He finally told Normand he must resign or be fired. Normand tendered a letter of resignation. Later that day, Hale met with and hired James Ritchie, a thirty-one year old, to replace Normand.

RIA contends that Normand failed to produce evidence to prove that RIA's stated reason for terminating Normand, for low sales production, was either false or merely a pretext. Normand argues that the evidence establishes that he was an excellent salesman whose sales declined in his last year of employment, basically reflecting the depressed conditions in the region's oil and gas and related business as well as the effect of RIA territorial realignments that substantially reduced his sales territory. Normand further contends that his declining sales appear worse in comparison to his prior sales record than in comparison to contemporaneous sales by other representatives in the region. Normand argues that he presented sufficient evidence for a reasonable jury to conclude that RIA did not terminate him for a single bad year, and that RIA's stated reason of low productivity was pretextual for the age discrimination he had proved.

In granting RIA's motion for judgment n.o.v., the district court found that "Normand's performance as a salesman of RIA products had, by mid-year 1986, reached an unacceptable low point; even with progressive prodding by his regional manager, Normand exhibited no promise of fulfilling his 'territorial management' goals or of making the required twenty calls per week."

## 2. *Realignments.*

Each year from 1984–86, RIA realigned its sales territories nationally, in a program that eventually cut Normand's territory by more than fifty percent (50%) of its "inven-

tory units" and removed his hometown from his territory. Normand contended that the realignment was intended, both nationally and in his particular case, to remove older sales people from RIA's employ. This issue was tried in vivid and minute detail, with evidence from several witnesses, an expert, statistics and anecdotes. When all was said and done, Normand proved nothing. By no measure could he establish that older RIA employers lost more territory from the realignments or were more likely replaced because of them. No "smoking gun" quip or quote suggested RIA officials were motivated by bias against older employees rather than pure market economics. We agree with the district court's conclusion that Normand's case was not furthered by this line of inquiry.

### 3. *Disparate Treatment.*

Normand was replaced by James Ritchie, who was thirty-one years old. Normand's commissions for July 1985 through June 1986, his last year of employment with RIA, were $31,468. Ritchie's commission earnings in 1986–87 for the same territory were $4,315 in new sales and $13,408 in renewals. Ritchie's total income for September 1986 through June 1987 was $27,-551, including $9,828 in salary advances. Normand received memoranda criticizing his sales performance; RIA produced no documents criticizing Ritchie's performance. Hale admitted that Ritchie's renewal income was a result of Normand's efforts. Hale also acknowledged that the territory and inventory cut from Normand's territory in 1986 was assigned to the Monroe territory and that a thirty-nine year old, Teeple, was hired as a sales representative for the Monroe territory. Teeple's and Ritchie's combined commissions for 1986–87 were less than Normand's commissions for 1985–86. However, from July 1987 to June 1988, Ritchie made over $42,000 with only 206 inventory units.

In 1986, Hale recommended that Webster Parish be reassigned to the Shreveport territory. Webster Parish contains Minden, which is Ritchie's and Normand's home. The restoration of Webster Parish to the territory benefitted Ritchie because it eliminated the thirty-mile drive to the closest part of his territory.

In 1986, Normand received a weekly advance against commissions of $125 per week. In 1986, Ritchie received an advance of $500 per week for thirteen weeks, $250 per week for the following thirteen weeks, and then $125 per week. Normand argued that RIA was attempting to eliminate older employees by reducing their territories, hiring younger replacement representatives, and increasing the new representatives' initial advances against commission to assist the new representative in making an adequate living in the territory. This salary plan, however, was available to all new representatives regardless of their age. RIA argues that no inference of discrimination could be drawn from comparing Normand and Ritchie because the data Normand utilized did not support the comparison. The district court concluded that Normand's attempt to show a distinction between RIA's treatment of representatives based on their age "is the weakest link in [his] theory," and that no inference could be drawn by the jury that Normand and Ritchie were treated differently.

### 4. *Discriminatory Statements and Other Evidence of Age Bias.*

Normand testified that he first noted RIA's age-based animus at the 1977 national sales meeting, which he attended with regional manager Harry Tchakarides, who emphasized Normand's youthful appearance. Normand also stated that at a 1980 meeting, he heard RIA president Hirsh refer to the recent termination of Howard Warning, an older employee, as "we got rid of the old bastard." As regional manager from 1980 to 1983, Normand observed RIA's age-based bias in hiring. RIA division manager, Ed Carlisle, rejected Normand's choice of a forty-six-year-old applicant for a sales representative post because of the applicant's age; Billie Dorgan rejected another applicant as "too old" for the job; Dorgan wanted to fire certain sales representatives saying they were not producing because they were "getting old";

and Carlisle and Dorgan instructed Normand to hire younger people and advised him to force resignations. However, from April, 1980 through October, 1983, when Normand was a regional manager, he hired four sales representatives over the age of forty. At his deposition, Normand testified that he had never received directions not to hire representatives over a certain age and that he was told older employees were an asset. In 1983, Dorgan discouraged Normand from returning to his former sales territory because the territory was too big for an "old person" to handle.

Normand attempted to establish the existence of RIA's historical "age bias animus" primarily through the testimony of several former RIA employees. This evidence was designed to prove a pattern or practice of discrimination that affected RIA managerial decisions in Normand's individual discrimination suit.

Most probative apart from Normand's testimony was that of former regional manager Charlotte Montgomery concerning the age bias of Carlisle and Dorgan, Normand's division supervisors. Montgomery was a regional manager from 1980 to 1984. Montgomery testified that Carlisle and Dorgan instructed her to harass an older sales representative, Todd Lanter, until he resigned. Montgomery said that Lanter's treatment was part of RIA's policy of "planned turnover" of older employees. Dorgan acknowledged the "planned turnover" policy. RIA officers gave Montgomery a "thumbs-up" sign when she reported Lanter's resignation.

Montgomery heard Dorgan refer to older employees as "old geezers," and heard Dorgan describe Henry Dirmann, an older sales representative, as "the old grandad." Montgomery also heard Dorgan refer to Tchakarides as "an old buzzard." Montgomery heard Dorgan comment of Normand that "older fellows who come in and have done things their way and have been successful are not ready to bite the bullet and teach their representatives in the manner we want them to do it and if they can't cut the mustard, they have to be cut out." [2]

Henry Dirmann, another older salesman who had been fired, testified that Hale, his and Normand's supervisor, said "we figured that we'd fire you now rather than wait eight and one-half months until you are fifty-five years of age, when we'd have to retire you...." RIA terminated Henry Dirmann in June 1985, at age fifty-four, for lack of production. In his last year, Dirmann made only nine sales, and averaged only six sales presentations per week. Dirmann was the second worst performer in his region. The worst performer, James Becnel, who was twenty-eight years old, was terminated at the same time as Dirmann.

Some of the age-related statements preceded Normand's constructive discharge by nearly a decade. Former regional manager, James Grogan, testified that in 1975, three national RIA officials told him that management wanted to get rid of Grogan's predecessor because he was too old. Grogan also testified that Verbofsky, the national sales manager, instructed him "don't hire anybody ... over forty." Grogan

---

**2.** When Montgomery resigned from her position of sales representative in 1984, she was forty-three years old and she was replaced by a fifty-year old woman. As a regional manager, Montgomery hired six representatives over forty-years old. Montgomery testified that when she became a regional manager in 1980 she received plaintiff's exhibit 21, "Analyzing the Application Form." This one page document was a written hiring guideline that stated: *"Date of Birth:* Is he between the age of 25 and 50 as required by the job? If not, experience proves that the odds are against his becoming a success as a salesman." Montgomery testified that age was a factor in hiring. At her deposition, however, she stated that she had never seen anything in writing directing discrimination against older employees. Every witness who had been an RIA regional manager denied using exhibit 21; Normand did not claim to have seen this document when he was a regional manager. Margaret Sailer, RIA director of human resources, explained that this document was part of a superseded 1970 employment manual, which was not in use when Normand was hired. By 1977, the RIA employment application did not ask the applicant's age. However, only the older representatives, Izard, Dirmann and Normand, had their birth dates noted on their employment applications. The district court found that Exhibit 21 had nothing to do with Normand.

complained to Hirsh and Umans about RIA's treatment of older employees and they responded "we are not interested in ... they are older, we want to get young men in." James Grogan was terminated in 1980 for selling products that directly competed with RIA products; further, the age-related comments he heard were made no later than 1976. Similarly, former sales representative Milton Margolin testified that "we started to see a lot of older types ... falling out of the company," and that in 1977 Waring told him that management was "looking for ... the IBM type," implying a young, aggressive sales force. Margolin was terminated in 1982 for soliciting orders by mail and by phone while he was on disability leave.

RIA contends that the "anecdotal" testimony of the "disgruntled ex-employees" is insufficient evidence to establish pretext. In support of this contention, RIA cites cases from seven other circuit courts, which held, in varying circumstances, that certain remarks were not relevant to the defendant employer's decision to terminate the plaintiff, and thus could not support an inference of discrimination.[3] The district court, citing some of these cases, held that statements that reflect age-based animus must be logically or reasonably tied to the decision to terminate the plaintiff. The district court found that only the discriminatory statements of Hale and Dorgan were sufficiently linked to Normand's termination to provide any probative evidence of discrimination. He concluded, however, that these statements were unrelated to the "decisional process" and thus were insufficient to overcome RIA's "overwhelming evidence" of Normand's poor performance. The district court similarly dismissed Montgomery's and Normand's testimony that age was a factor in employment decisions.

### 5. *Conclusion.*

The ultimate question in an age discrimination case is whether the plaintiff has proved that age was a motivating factor in the defendant's adverse employment decision. *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1095. Normand's jury had before it evidence of age-related comments made about Normand and others by his direct supervisors;[4] of the company's policy for "planned turnover" of sales personnel; and of more favorable treatment of Normand's young successor Ritchie, shown by the withholding of negative performance memoranda and the return of Minden, Ritchie's and Normand's hometown, to Ritchie's territory. Marshalled against RIA's defense that Normand became an unsatisfactory employee were the undeniable economic downturn in Louisiana at that time, combined with Normand's years of outstanding service to RIA and his creditable sales performance until only six months before the constructive discharge.

Normand has presented more than his subjective belief of discrimination, *Elliott*, 714 F.2d at 564, and more than conclusory statements of age discrimination. *Id.* at 566. This was a close case, based upon the accumulation of circumstantial evidence and the credibility determinations that

**3.** See *Merrick v. Farmers' Ins. Group*, 892 F.2d 1434, 1438–39 (9th Cir.1990); *Gagne v. Northwestern Nat. Ins. Co.*, 881 F.2d 309, 314 (6th Cir.1989); *Smith v. Firestone Tire & Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir.1989); *Mauter v. Hardy Corp.*, 825 F.2d 1554, 1558 (11th Cir. 1987); *Gray v. New England Tel. & Tel. Co.*, 792 F.2d 251, 254–55 (1st Cir.1986); *Haskell v. Kaman Corp.*, 743 F.2d 113, 120 (2d Cir.1984); *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405 (7th Cir.1984); *Smith v. Flax*, 618 F.2d 1062, 1066 (4th Cir.1980).

In these cases, the remarks attributed to the defendants were either made by someone who did not participate in the decision to terminate the plaintiff, or they were isolated comments and were the plaintiff's only evidence of discrimination. Normand, however, presented more than the discriminatory comments of his direct supervisors as is fully outlined in the text.

**4.** Evidence of Dorgan's and Hale's use of age-related statements is probative of their motivation in terminating Normand. *See Fowler v. Carrollton Public Library*, 799 F.2d 976, 984 (5th Cir. 1986). Furthermore, indirect references to an employee's age, such as those made by Hale and Dorgan, can support an inference of age discrimination. *Hansard v. Pepsi Cola Metropolitan Bottling Co.*, 865 F.2d 1461, 1466 (5th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 129, 107 L.Ed.2d 89 (1989) (citing *Bienkowski v. American Airlines*, 851 F.2d 1503, 1507 (5th Cir.1988)).

were required. We conclude that "reasonable men could differ" about the presence of age discrimination, *Boeing*, 411 F.2d at 374, and we must thus reverse the district court's judgment n.o.v. and reinstate the jury's verdict.

## D. Willfulness.

█ Normand contends that the district court erred in granting RIA's motion for judgment n.o.v. on the issue of willfulness. A violation of the ADEA is willful if the defendant-employer acts in "reckless disregard" of the requirements of the ADEA. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128–29, 105 S.Ct. 613, 625–26, 83 L.Ed.2d 523 (1985). A finding of willfulness is important because it entitles the plaintiff to liquidated damages. *Hansard v. Pepsi–Cola Metropolitan Bottling Co.*, 865 F.2d 1461, 1470 (5th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 129, 107 L.Ed.2d 89 (1989) (citing *Trans World*, 469 U.S. 111, 125, 105 S.Ct. 613, 623–24 (1985)). However, "liquidated damages are a punitive sanction and should be reserved for the most egregious violations of the ADEA." *Id.*

█ Normand has presented a weak case of age discrimination, with just enough evidence to support the jury's verdict. We find that, as in *Hansard*, the "evidence in this case supported neither side overwhelmingly." *Id.* at 1464. Because we find no evidence in the record to support the jury's finding that RIA's conduct was so egregious that it amounted to a willful violation of the ADEA, we affirm the district court's judgment n.o.v.

## E. Mitigation.

█ Normand also contends that the district court erred in granting RIA judgment n.o.v. on the issue of mitigation. We must apply the *Boeing* standard to determine whether a reasonable jury could have found that Normand mitigated his damages. The employer in a Title VII case has a burden of proving that the plaintiff has not exercised due diligence in seeking comparable employment after an unlawful discharge. *Sellers v. Delgado Community*

*College*, 839 F.2d 1132, 1139 (5th Cir.1988, *cert. denied*, —— U.S. ——, 111 S.Ct. 525, 112 L.Ed.2d 536 (1990) (citing *Marks v. Prattco, Inc.*, 633 F.2d 1122, 1125 (5th Cir. 1981)). To meet this burden, an employer must demonstrate that comparable work was available and that the plaintiff did not seek this work. *Id.* (citations omitted).

█ Normand testified that he registered with Snelling & Snelling, a major employment agency, answered newspaper advertisements, telephoned several prospective employers, and sent numerous resumes to different corporations. Normand also testified that he reapplied to RIA without success. Normand eventually found a job selling insurance and computer terminals on commission. RIA attempted to counter Normand's testimony and satisfy its burden of proving that Normand failed to use diligence in conducting a job search through the testimony of Dr. Michael Cook, who stated that commissioned sales jobs were plentiful. RIA also attempted to impeach Normand's testimony that he applied for other jobs. The mitigation evidence introduced at trial presented a credibility determination, which was properly in the province of the jury. *Boeing*, 411 F.2d at 375. Therefore, we reverse the district court's grant of a judgment n.o.v. on the issue of mitigation and reinstate the jury's verdict.

## F. New Trial Motion.

The district court did not rule on RIA's alternative motion for a new trial. RIA argues that if the court had ruled, it would have granted a new trial because it granted RIA's motion for a judgment n.o.v. Accordingly, RIA contends that if this court reverses the judgment n.o.v. it should grant RIA's motion for a new trial, based on the allegedly erroneous and prejudicial admission of the testimony of ex-employees Grogan, Margolin, Dirmann, and Izard and the use of plaintiff's Exhibit 21, "Analyzing the Application Form." RIA's new trial motion is also based on the district court's refusal to give RIA's requested jury instruction that "seniority and age dis-

**866**

crimination are unrelated." *See Williams v. General Motors,* 656 F.2d 120 (5th Cir. 1981).

We read the record differently. Although the court did not expressly rule on RIA's motion for new trial,[5] its unequivocal judgment reflects an intent to dispose of the case completely and, inferentially, to reject the new trial motion. Reviewing the motion, and noting that RIA never sought a clarification of the judgment that would decide the new trial motion, we are convinced that it was denied.

Our appellate review of the denial of a new trial motion is narrow, founded in the abuse of discretion standard. *Shows v. Jamison Bedding, Inc.,* 671 F.2d 927, 930 (5th Cir.1982). RIA's particular grounds for seeking a new trial are not persuasive. To the extent the company's motion rests on the court's improper admission of testimony by four witnesses and plaintiff's Exhibit 21 we are limited by the abuse of discretion standard. *Jon–T Chemicals, Inc. v. Freeport Chemical Co.,* 704 F.2d 1412, 1417 (5th Cir.1983) (citations omitted). The district court has wide discretion in deciding whether the probative value of evidence outweighs its prejudicial effect. *Pregeant v. Pan American World Airways, Inc.,* 762 F.2d 1245, 1248 (5th Cir. 1985) (citations omitted). The court did not abuse its discretion by admitting the testimony in question, even though its probative value varied from moderate to nil, *see* n. 3 *supra,* but none of this evidence was critical to either party's case.

Second, although a new trial is the appropriate remedy for an erroneous jury instruction, *Kendrick v. Illinois Central Gulf Railroad Co.,* 669 F.2d 341, 343 (5th Cir.1982) (citing 11 C. Wright and A. Miller,

Fed. Prac. & Proc. § 2805 (1973)), the court's refusal to give the jury instruction sought by RIA in this case did not mislead or confuse the jury. *Rehler v. Beech Aircraft Corp.,* 777 F.2d 1072, 1081 (5th Cir. 1985). The record does not suggest that the jury could have believed that references to "seasoned" employees meant "older" employees and thus required the corrective instruction that "seniority and age discrimination are unrelated...." *Williams v. General Motors,* 656 F.2d 120 (5th Cir. 1981).

## CONCLUSION

Normand has presented a close case of age discrimination, which rested heavily on credibility determinations and for that reason had to be resolved by the jury. He presented sufficient evidence for a reasonable jury to conclude that RIA discriminated against him because of his age and that he mitigated his damages. Normand did not present sufficient evidence for a reasonable jury to conclude that RIA terminated him in willful violation of the ADEA. Therefore, we reinstate the jury's verdict on age discrimination and mitigation.

**REVERSED** in part, **AFFIRMED** in part.

---

**5.** The better practice would have required an express ruling by the district court on RIA's new trial motion. Federal Rule Civ. Proc. 50(c) provides in part:

(1) *if the motion for judgment notwithstanding the verdict, provided for in subdivision (b) of this rule, is granted, the court shall also rule on the motion for a new trial,* if any, by determining whether it should be granted if

the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying *the motion for the new trial....* in case the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered.

(emphasis added.)