United States Court of Appeals,

Fifth Circuit.

No. 91–8666.

JAMES B. DAVIS, Plaintiff–Appellee, Cross–Appellant,

v.

The FIRST NATIONAL BANK OF KILLEEN, TEXAS, Defendant–Appellant, Cross–Appellee.

Nov. 9, 1992.

Appeals from the United States District Court for the Western District of Texas.

Before POLITZ, Chief Judge, WISDOM and WIENER, Circuit Judges.

WIENER, Circuit Judge:

In this case, implicating the Age Discrimination in Employment Act (ADEA),[1] Appellant/Cross–Appellee First National Bank of Killeen (the Bank) convinced the district court to grant part of the Bank's motion for judgment notwithstanding the verdict (j.n.o.v.) to the extent the jury found that the Bank willfully violated the ADEA by constructively discharging Davis. The jury had awarded Davis $75,000 in damages. The Bank appeals the court's refusal to grant the remaining part of the motion for j.n.o.v. for other amounts awarded by the jury in connection with the discharge of Davis by the Bank, which the jury found to be constructive and to be discriminatory on the basis of age. By cross appeal, Davis complains of the district court's j.n.o.v. reversing the jury's finding that the Bank knowingly violated the ADEA, and insists that the trial court erred in calculating the front pay awards in favor of Davis. Acknowledging that the facts present a close question but concluding nonetheless that the evidence is insufficient to supply the required nexus between the Bank's treatment of Davis and his age, we reverse the judgment of the district court and render judgment dismissing Davis's action.

I

FACTS AND PROCEEDINGS

Davis went to work for the Bank in 1955 and was employed there continuously until he

_____

[1] 29 U.S.C. §§ 621 *et seq.*

resigned effective May 1, 1988, a period of approximately 33 years. In the course of his banking career, Mr. Davis rose to the position of Vice President in Charge of Commercial and Consumer Loans, a title he held at the time the present holding company owner acquired the Bank. He was also a voting member of the Loan Committee at that time, but was relieved of voting status following the change in ownership.

In July of 1987, Davis suffered a heart attack and was away from work for approximately five months. In November of that year, his doctor advised that Davis could return to work, beginning on a half-day basis, but the Bank's president advised Davis to stay home until he could return on a full-time schedule. In mid-December Davis met with the Bank's president to discuss full-time return and was advised that when he did it would be as supervisor of the dealer department, at the same salary and with the title of Vice President.

Prior to his heart attack, Davis had been a member of a task force organized to analyze dealer loans and make recommendations for improved procedures. Following his heart attack, Davis was replaced on the task force by Mr. Steve Mills, an executive employee transferred to the Bank from another bank owned by the same holding company. In his 30's, Mills also replaced Davis in the consumer loan department of the Bank.

When Davis returned to work he found he was the only member of the dealer department and that there were no personnel there for him to supervise. He did not have a secretary or anyone under his direct supervision to assist him. Neither before his heart attack nor after his return was Davis advised as to his duties, functions or responsibilities in the dealer department. He was furnished no documentation regarding changes in policies or procedures in that department, and his letter to the Bank's president concerning goals for the department went unanswered. In the conduct of his new assignment he was criticized by voting members of the Loan Committee in ways that Davis considered inconsistent and unfair.

In April, 1988, the president convened a meeting with Davis at which Mr. Rick Carlisle was present. Davis was advised that he had lost credibility with and the confidence of management and ownership. The president advised Davis to consider an early retirement resignation; that otherwise

he would face being placed on probation. Carlisle, former President, CEO and Chairman of the Board of the Bank testified as to Davis's loyalty and competence but acknowledged that in light of Carlisle's impression that the new ownership group had decided to replace the previously existing management team with new employees more attuned to the style and policy views of the new ownership, Davis's future was bleak. It was Carlisle's opinion that the new ownership had decided to put their own people in to replace executives of the Bank whose tenure pre-dated the holding company's acquisition. Carlisle was satisfied that the officers from the previous regime who still remained at the Bank simply did not fit in with the new concepts brought in by the holding company after the acquisition. He speculated that new management could ease out members of the preexisting regime by making it difficult for them to get their loans approved. Carlisle observed that 15 officers from the former regime were no longer with the Bank; that only one was an active officer; and that a second was a member of the Board only. Even Carlisle admitted his disagreement with style and policy of the new management. According to Davis, Carlisle said nothing during the meeting with the Bank's president, and Davis himself gave no indication to the President whether he would resign as requested, effective May 1, 1988, or continue subject to probation. Davis stated that he knew, however, that the die was cast by the tone of the meeting and the statements about loss of confidence and credibility.

Another former officer, Mr. Jack Vernon, testified that in his opinion the holding company intentionally weakened the ability of the pre-existing officers to perform, and that new management preferred not to have members of the pre-acquisition officer corps, with their close ties to the community, involved in running the Bank. Vernon testified that he observed a pattern of replacing members of the pre-existing team with younger employees.

Still without advising of his decision, Davis asked the president on the day following the meeting with Carlisle, for permission to take three weeks' vacation which permission was granted. Despite Davis's postponement of making his decision, Carlisle wrote on that day (April 19, 1988) announcing to other bank personnel that Davis would retire, effective May 1. Thereafter, Davis wrote to Carlisle, the Bank president and other members of the Board, recounting his version of the

April 18th meeting, his shock, his financial needs, and the inevitability of his termination by current management, concluding that he had no choice but to end his 33 years of service by resigning effective May 1, 1988. He was again replaced by Mills.

Davis testified that, following the effective date of his termination, he sought employment in and around Killeen, attempting to sell water purifiers, to obtain an insurance license, and to become a salesman for A.L. Williams Company. He further testified that efforts to obtain bank employment were fruitless given the condition of the banking industry in the Killeen area, as well as his age and physical condition but that he had remained willing to return to the Bank as Vice President in Charge of Commercial and Consumer Loans.

According to witnesses for the Bank, new management determined on the basis of internal audits that some $5 million in loans had to be charged off and that significant changes were needed in the Bank's lending policy as well as other policies and procedures. Stricter Comptroller of the Currency guidelines and regulations as well as the chaos in the banking industry in Texas and surrounding states were other reasons attributed by the Bank's witnesses to the need for changes. There is no dispute but that drastic policy and philosophy changes were made and that the changes were shocking to employees whose service pre-dated the change in ownership. This was particularly true for loan officers whose procedures were changed most drastically. Also uncontested is the fact that when Mills was brought in from another bank following Davis's heart attack, he (Mills) was under the ADEA's triggering age of 40 years, and his salary was "slightly less" than Davis's.

Witnesses for the Bank also testified that Davis demonstrated a lack of adaptability to the new lending environment and that his deficiencies were pointed out to him but that, in the opinion of the Bank's president, Davis's performance did not improve, leading to the meeting of April 18, 1988. The president testified that his purpose in calling the April 18th meeting was to place Davis on probation, and that when the 90–day probation was announced to Davis he responded that he was not going to accept probation. The president testified that he was surprised by the reaction because probation was not offered as a choice; but that in light of the unexpected reaction, he told Davis he should consider early retirement and that the Bank would confect an early retirement package for Davis to consider.

According to the president, he was informed by Davis the next day that he (Davis) would take early retirement after using his remaining vacation prior to the effective date of resignation. April 19, 1988, was Davis's last day at work.

The early retirement package proposed by the Bank was presented to and accepted by Davis on April 27, 1988. In addition, Davis received a lump sum distribution of $204,000 from the Bank's profit sharing plan, of which $179,340.74 represented the Bank's contributions, earnings and forfeitures.

The record reflects that officers of the Bank who were 40 years of age or older and whose employment pre-dated the holding company's acquisition were still employed by the Bank at the time of trial, and that new officers over the age of 40 and even over the age of 50 had been hired after the acquisition. The Bank's witnesses also disputed Davis's version of his post-termination efforts to obtain employment, contending that he made no significant efforts until his severance pay was exhausted and that he elected to work part-time as a matter of choice.

Davis filed suit in federal district court on February 20, 1990. On August 30, 1990, Davis filed his First Amended Complaint alleging 1) that he was demoted by the Bank because of his age, in violation of the ADEA; 2) that he was constructively discharged from employment by the Bank because of his age; 3) that he was defamed; 4) that the Bank intentionally inflicted emotional distress on him; and 5) that the bank acted with wanton disregard, warranting an award of exemplary damages.

On September 19, 1990, the district court granted Davis's motion to dismiss his claims for defamation and intentional infliction of emotional distress, leaving for trial only his claims for age discrimination and exemplary damages. On October 16, 1990, the court granted partial summary judgment in favor of the Bank, holding that exemplary damages are not recoverable under the ADEA.

The case was tried to a jury on October 25 and 26, 1990. The Bank made an unopposed motion for directed verdict at the close of Davis's evidence which motion the court granted, dismissing the claim of demotion based on age. When all evidence was in, the jury returned a verdict for Davis, awarding him $75,000 for the Bank's willful violation of the ADEA by constructively

discharging Davis.

Each party made post-judgment motions. The Bank's motion for j.n.o.v. was granted in part, the court reversing the jury's finding of willfulness. Final judgment was entered on December 3, 1991, awarding Davis $75,000 in back pay, $131,800 in front pay for four year's salary, pre-judgment interest at the rate of 10% per annum, and attorney's fees equaling one-third of the judgment. The Bank timely filed its notice of appeal on December 13, 1991, and Davis timely filed his notice of cross-appeal on December 20, 1991.

II

ANALYSIS

A. *Standard of Review*

A substantive review challenging a jury verdict is reviewed under our long-standing standard articulated in *Boeing v. Shipman.*[2] Under that standard we seek to determine whether

> reasonable and fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions.... A mere scintilla is insufficient to present a question for the jury.... However, it is the function of the jury as the traditional finder of facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

In recent years we have applied the test of *Boeing v. Shipman* in numerous age discrimination cases.[3]

B. *Waiver*

Before addressing the substantive issue of sufficiency of the evidence to support the jury verdict, we must answer the preliminary procedural question whether the Bank waived its right to challenge the verdict when it failed to renew its motion for a directed verdict at the close of all evidence. Apparently the first time this issue was raised was on appeal. On the one hand, we agree with our colleagues of the Seventh Circuit that appellate courts should "not view favorably the raising of an issue, particularly a technical one, for the first time on appeal."[4] We have observed on the other hand, however, that both this circuit and the Seventh Circuit have approached this issue with a "liberal

---

[2] 411 F.2d 365, 374–75 (5th Cir.1969) (en banc).

[3] *See, e.g., Normand v. Research Inst. of Am.,* 927 F.2d 857, 859 (5th Cir.1991).

[4] *Pittsburgh–Des Moines Steel Co. v. Brookhaven Manor Water Co.,* 532 F.2d 572, 576 (7th Cir.1976).

spirit" in pursuit of "securing a fair trial for all concerned in the quest for truth."[5]  In essence, the circuit courts have inquired whether prejudice would result from waiving technical compliance with Fed.R.Civ.P. 50(b).

At the close of Davis's case, the Bank made two motions for directed verdict, one of which was granted and the other declined "at this time."  The Bank then called one witness, after which Davis was recalled to the stand.  Then both sides closed, after only a few minutes had elapsed since the Bank had made the two motions for directed verdict.  This de minimis lapse equates with the one we forgave in *Merwine v. Board of Trustees.*[6]  We are constrained to do so here.

C. *Evidence of Age Discrimination*

Although there is agreement on many of the facts of this case, the parties vigorously contest those surrounding the issues of constructive discharge and willfulness on the part of the Bank.  Based on its version of the facts, the Bank insists that Davis had no reasonable basis to conclude that his discharge was inevitable merely because the Bank proposed a 90–day probationary period.  Davis on the other hand insists that he was given a Hobson's Choice because whether he accepted the proposal of continued employment under probation or took early retirement by resigning as suggested by the Bank, he was on the way out in a very short time.  Also, Davis insists that the jury correctly found not only constructive discharge based on age but intentional or willful conduct by the Bank in its actions.

Those contested issues become moot, however, if our examination of the evidence in the record of this case convinces us that such evidence is insufficient to demonstrate that the Bank's treatment of Davis was driven by discriminatory animus based on age.  For purposes of examining the sufficiency of such evidence, then, we assume without deciding that Davis was constructively discharged by the Bank, and that the Bank did so willfully.

---

[5]*Bohrer v. Hanes Corp.,* 715 F.2d 213, 217 (5th Cir.1983) (quoting *Bonner v. Coughlin,* 657 F.2d 931, 939 (7th Cir.1981) (quoting *Ohio–Sealy Mattress Mfg. Co. v. Sealy, Inc.,* 585 F.2d 821, 825 (7th Cir.1978), *cert. denied* 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979))), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984).

[6]754 F.2d 631, 635 (5th Cir.), *cert. denied,* 474 U.S. 823, 106 S.Ct. 76, 88 L.Ed.2d 62 (1985).

Although recent statutory enactments and at least one judicial decision have created narrow exceptions to the doctrine of at-will employment in Texas, that doctrine is alive and well, particularly in the private sector—so much so as to require no citation here. Davis does not allege an employment contract with the Bank and thus does not dispute that his employment was subject to termination without cause. Rather, he insists that he was terminated for cause but that such cause was illicit, i.e., that at age 53 he was terminated for no real reason other than to permit the Bank to replace him with an employee under the age of 40, at a lesser salary.

Even though Davis stated a cause of action upon which relief could be granted under the ADEA when he alleged and proved that he was over the age of 40 when his employment ceased and that his replacement was under the age of 40, a case for age discrimination here is at best extremely weak. Evidence presented by Davis and by the Bank paints a clear picture of new corporate ownership coming in with new and drastically different business methods, policies and philosophies, and implementing them to a large extent by replacing carry-over employees from the old regime with new bank officers who were willing and able to implement the plans of the new owners. Significantly, however, the evidence demonstrates that among those from the prior regime who were terminated there were employees both over and under the age of 40; and that among the new hires were persons both over and under the age of 40.

True, the record is not totally devoid of evidence that might suggest age discrimination. In addition to the key fact that Davis was replaced by someone significantly younger than he, the record demonstrates that Davis worked without criticism by the new regime for almost two years prior to his heart attack; that he was asked to think about early retirement; that his letter concerning departmental goals went unanswered; and that, while it is true that even the younger employees of the prior regime were being closely scrutinized and required to improve their performances, replacements tended to be younger than their immediate predecessors.

On the other hand, the record evidence supporting the Bank's proffer of non-discriminatory reasons for Davis's problems is strong. Clearly he did not adapt to the new standards imposed by the new owners. This failure to adapt—which Davis admits but attempts to justify by offering criticism

of the new procedures adopted by his new employers—is strikingly similar to the justification attempted by the plaintiff in *Guthrie v. Tifco Industries,*[7] which we rejected as insufficient to overcome the valid reasons for termination given by the employer in overcoming allegations of age discrimination. The testimony of Carlisle and Vernon, far from indicating age discrimination, confirms the Bank's position that Davis was among a number of pre-acquisition employees who had failed to accept or adjust to the changes wrought by the new regime. Even though Davis's job performance did not constitute a "deliberate violation of both company policies and management directives" as had the performance of the employee in *Bohrer v. Hanes,*[8] there is sufficient evidence that, upon his return, Davis simply could not or would not adapt to the new standards on which his superior insisted.

Neither can we overlook the fact that the "young" employee who replaced Davis had to be brought into the Bank originally when Davis suffered his heart attack and could not work for many months. That replacement employee was already working for another bank owned by the same holding company; absolutely nothing approaching invidious age discrimination can be inferred from that initial occurrence; and in turn it supports the non-discriminatory explanation given by the Bank for having the same younger employee replace Davis after permanent severance of employment.

Moreover, a careful reading of the record demonstrates that the jury heard repeated references to the pre-acquisition employees as the "old" employees. Although ostensibly meaning nothing more than that such persons worked for the Bank before the holding company acquired it, we speculate that the jury may well have become confused—possibly by design of counsel—in thinking the reference was one to chronological age, not merely to preacquisition employment.

We repeat that it is not our province to re-weigh the evidence and second guess the jury, and the foregoing discussion should not be read as though we are doing so. Under *Boeing v. Shipman,*[9]

---

[7] 941 F.2d 374, 378–79 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1267, 117 L.Ed.2d 4954 (1992).

[8] 715 F.2d at 218–19.

[9] 411 F.2d at 374–75.

we are only permitted to determine whether there is sufficient evidence to permit reasonable jurors to reach different conclusions. The different conclusions referred to here are not whether Davis was treated fairly, or whether the Bank acted unfairly toward Davis, or whether Davis's criticism of the new policies was valid, or whether the Bank "set up" Davis after his return so that, as a member of the pre-acquisition coterie of officers, he was bound to stumble and therefore be fired, or anything else relative to the employer-employee relationship *except* the part if any played by age in the parting of the parties' ways. When we scour the record for evidence of the nexus between Davis's age and his willful constructive discharge (which we here assume), we find at most the proverbial scintilla but nothing more. Unlike the record in *Normand v. Research Institute of America* in which we found "just enough evidence to support the jury's verdict,"[10] the record here simply does not contain that "just enough" modicum of evidence of age discrimination to supply that all-important nexus between the Plaintiff's age and his assumed constructive discharge. We hold, therefore, that the district court erred in refusing to grant the Bank's motion for judgment n.o.v. on the issue of the discrimination proscribed by the ADEA.

D. *Other Issues on Appeal and Cross–Appeal*

As the district court partially granted the Bank's motion for j.n.o.v. to the extent of willful or intentional age discrimination, and as we now hold that the evidence is not sufficient to support the jury's finding of age discrimination *vel non,* our reversal and rendering of a take nothing judgment against Davis renders moot the other issues presented by the Bank's appeal and Davis's cross appeal. And as we are thus not required to address those issues, we shall not.

III

CONCLUSION

Even when we assume for the sake of our consideration here that Davis was constructively discharged by the willful acts of the Bank, a careful combing of the record reveals not only a surplus of evidence to support the Bank's contention that it made no employment decision vis-à-vis Davis on the basis of age; but likewise a dearth of evidence to support the essential finding of the element of

---

[10]*Normand,* 927 F.2d at 865.

age discrimination.  We hold, therefore, that the evidence in the record of this case is insufficient to support the jury's factual finding of age discrimination by the Bank, so we REVERSE the judgment of the district court and RENDER a take nothing judgment against Davis, dismissing his age discrimination claims under the ADEA, and likewise dismissing all remaining issues of the Bank's appeal and Davis's cross-appeal.