REVISED – February 26, 1999

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 97-11339

_____

ALCATEL USA, INC.,

                              Plaintiff-Counter-Defendant-
                                 Appellee-Cross-Appellant,

                    versus

DGI TECHNOLOGIES, INC.,

                              Defendant-Counter-Claimant-
                                 Appellant-Cross-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____

January 29, 1999

Before JOLLY, WIENER, and STEWART, Circuit Judges.

WIENER, Circuit Judge:

     The complex intellectual property action that we hear on
appeal today involves a multifaceted dispute between two
competitors in the telecommunications equipment manufacturing
industry.  Plaintiff-Counter-Defendant-Appellee-Cross-Appellant
Alcatel USA, Inc. (formerly DSC Communications Corporation ("DSC"))
filed suit against Defendant-Counter-Claimant-Appellant-Cross-
Appellee DGI Technologies, Inc. ("DGI"), alleging that DGI
infringed DSC's copyrights, misappropriated its trade secrets, and
engaged in unfair competition by misappropriating its time, labor,
skill and money.  DGI, in turn, asserted that DSC violated § 2 of

the Sherman Act, interfered with DGI's prospective business relations, and also engaged in unfair competition. After a lengthy trial, the district court entered a set-off judgment in favor of DSC and an order enjoining DGI from selling the infringing products.

For the reasons explained below, we affirm the district court's grant of a judgment as a matter of law ("JML") in favor of DSC, dismissing DGI's antitrust claim. We also affirm the jury's determination that damages are due to DSC on its claim of misappropriation of trade secrets, and the district court's injunction against DGI, based in part on this claim. Because DSC misused its copyrights, however, we reverse the portions of the injunction tailored by the district court as relief from DGI's copyright infringement. Concluding that DSC's state law claim of unfair competition by misappropriation is preempted, we also reverse the district court's denial of a JML in favor of DGI on this issue, and vacate all legal and equitable relief awarded to DSC for this claim, including the portion of the damage award attributable thereto. Because the monetary damages award to DSC was not sufficiently itemized to permit us to modify the district court's judgment and render a modified judgment, we remand for that court to do so, taking into account the elimination of state unfair competition damages. Finally, we reverse the award of damages in favor of DGI on its claims for tortious interference and unfair competition, concluding that these claims are not supported by the evidence.

2

I

FACTS AND PROCEEDINGS

DSC designs, manufactures, and sells equipment ("switches") comprising telephone switching systems. Its customers are long-distance telephone service providers, such as MCI and Sprint. A telephone switch routes long distance telephone calls to their destinations.[1] DSC switches are controlled by its copyrighted operating system software. DSC regularly implements new features in its switches by upgrading its software, a process that costs DSC millions of dollars.

DSC does not sell its operating system software ⸺ as it does the switches ⸺ but instead licenses its use pursuant to a licensing agreement. The licensing agreement provides that (1) the operating system software remains the property of DSC; (2) the customer has the right to use the software only to operate its switch; (3) the customer is prohibited from copying the software or disclosing it to third parties; and (4) the customers are authorized to use the software only in conjunction with DSC-manufactured equipment.

The record evidence shows that DSC's customers, like other long distance providers, frequently need to expand the call-handling capacity of their switches. One way to expand the call-handling capacity of DSC switches is to add groups of "cards" to the switch. Prior to 1989, DSC was the only manufacturer of

---

[1]For a detailed description of the technology involved in this case, see DSC Communications Corp. v. DGI Technologies, Inc., 81 F.3d 597 (5th Cir. 1996) ("DSC I").

expansion cards for its own switches.  In 1989, DGI was founded to design and sell such cards for use with DSC switches.

DGI contends that it developed its cards by analyzing DSC's unpatented products and then duplicating their functionality —— a process referred to as "reverse engineering."  DGI initially obtained a used DSC switch containing a multitude of cards and a set of switch owners manuals ("DSPs" or "DSP manuals") from an investor.  Once DGI had determined the functionality of DSC's products, it designed its own to perform these same functions using newer-generation electronics and adding additional features.  DGI further insists that, from its inception, DSC repeatedly attempted to thwart DGI's entry into the market.  For instance, DSC threatened to insert a software "patch" in its operating system software to render DGI's cards inoperable on DSC-manufactured switches, and in fact did insert such a patch, but was never successful in disabling the DGI products.  DGI also notes that in 1991, before it had introduced its first product for sale, DSC sent a letter to its switch owners, threatening to void their switch warranties if they used DGI cards and claiming that DGI refused to provide DSC a card to test, an assertion that DGI maintains was untrue.  Finally, DSC (1) refused to inform its customers of the compatibility of DGI's cards, even after testing them, and (2) hired investigators to go through DGI's trash.

DSC, on the other hand, asserts that DGI did not engage in legitimate reverse engineering, but rather misappropriated DSC's intellectual property by wrongfully obtaining schematics and

4

manuals provided only to DSC customers on the express condition that there be no disclosure to third parties.  DSC also notes that each manual contained a plainly visible copyright notice.

In any event, between 1992 and 1994, DGI developed and introduced four DSC-compatible cards — the Digital Trunk Interface ("DTI"),[2] the Bus Terminator ("BT"),[3] the Digital Tone Detector ("DTD"),[4] and the Pulse Code Modulation Interface ("PCMI").  None of these initial DGI cards were <u>microprocessor</u> cards, however.  A microprocessor card contains <u>firmware</u>, which is software embedded in a memory chip on the card.  When installed in a switch, a microprocessor card controls the "boot up" — that is, it downloads DSC's copyrighted operating system software into its random access memory ("RAM").  A DTI, DTD, or BT card alone cannot expand the capacity of a switch; a customer must install a group of cards together with a microprocessor card to achieve expansion.  For this reason, DGI obtained DSC microprocessor cards — then known as MP-2s — in the used market to sell along with three DGI cards.  This enabled DGI to offer a customer a complete expansion card complement, which it did.

In 1995, as a result of a new dialing plan implemented by the

---

[2]DTI cards translate incoming signals from the format of the incoming trunk line that carries long distance calls to the switch format and back.

[3]BT cards check and regulate the various circuits between the cards in a metal cabinet called a frame.

[4]DTD cards detect and handle dial tones.

Federal Communications Commission ("FCC")[5] and customer demands for new features, DSC revised and expanded its operating system software. These changes required DSC customers to upgrade to a new microprocessor card — the MP-8. As few MP-8 cards were available on the used market, DGI was no longer able to offer a complete card complement. Its marketing problems were exacerbated by DSC's practice of offering substantial discounts to customers who purchased whole complements of cards from DSC, but charging much higher prices for individual MP-8 cards. This motivated DGI to develop its own microprocessor card — the DMP-2800.

To develop a microprocessor card, DGI had to overcome several difficulties. First, DGI needed to understand DSC's firmware. For this purpose, DGI purchased an MP-8 card and, using a "burner" to remove the DSC firmware from a memory chip, obtained the machine-readable object code. DGI engineers then used a process called "disassembly" to convert the firmware into human-readable form. In this way, DGI was able to write its own firmware — which it claims is not substantially similar to DSC's firmware — for its DMP-2800 microprocessor card. DSC asserts that DGI violated the copyright on its firmware when it copied DSC's firmware several times in this process.

Second, the DGI microprocessor card had to accept a download from the switch of the DSC operating system. To obtain the

_____

[5]Recently, the United States ran out of three-digit area codes, which had traditionally used only a 0 or 1 as the middle digit. As a result, the FCC established a new dialing plan that provided for the use of other numbers as the middle digit.

software needed for this function, several DGI engineers took an MP-8 card to NTS Communications ("NTS"), a DSC switch owner/ software licensee and DGI customer. There, Ernie Carrasco, an NTS employee who also consulted for DGI, placed the MP-8 card into an NTS switch and copied the operating system to a laptop computer. DGI engineers then took the laptop back to DGI. DSC maintains that DGI never told NTS that it was copying and removing DSC's copyrighted software, only that it was "testing" MP-8 cards.

DGI engineers returned to NTS several times to test MP-8 cards containing versions of DGI's firmware. To avoid having to perform all this testing at NTS, DGI modified an MP-8 card to include a device called a "punch" card or "snooper" card, which monitored the firmware during the operating system download. Using this snooper card, DGI was able to understand which parts of the DSC firmware were accessed during the "boot" of the operating system. DSC maintains that DGI used this snooper card to copy the messages contained in DSC's copyrighted operating system software. It insists that, but for DGI's "theft" of DSC's operating system, it would have been extremely expensive and time-consuming for DGI to develop its own microprocessor card.

DGI counters that the copy was used only to discern the size of the operating system download to the MP-8 card, as it was investigating the possibility of upgrading the older MP-2 card. DGI insists that, as the content of the software was irrelevant in determining its size, it never even disassembled the operating system software from unreadable machine language.

7

DSC filed suit in 1994, alleging that DGI misappropriated its trade secrets, and engaged in unfair competition by taking advantage of the time, labor, skill, and money that DSC had invested in its switches and cards. DGI counterclaimed, asserting that DSC (1) violated the Sherman Act by monopolizing or attempting to monopolize the relevant product market for expansion products compatible with DSC telephone switches; (2) tortiously interfered with DGI's contractual relations; and (3) engaged in unfair competition. In 1995, DSC filed a supplemental complaint, asserting direct and indirect copyright infringement claims.[6] The district court preliminarily enjoined DGI from removing DSC's operating system software from customer facilities, and we affirmed.[7]

After a three week trial, the jury returned a mixed verdict, finding that DSC violated the Sherman Act, interfered with DGI's contractual relations, and engaged in unfair competition, and that DGI infringed certain DSC copyrights, engaged in unfair competition by misappropriating DSC's time, labor, skill, and money, and

---

[6]DSC's original complaint alleged that DGI misappropriated its trade secrets, violated the Lanham Act, and engaged in unfair competition/palming off by deceiving prospective customers "as to the origin, sponsorship, affiliation or approval" of its products. Thereafter, DSC filed a supplemental complaint in which it alleged that DGI's actions also violated the Copyright Act. In light of facts and evidence introduced during the first week of trial, DSC submitted proposed jury questions and instructions — intended to replace and supersede those that it had previously filed — in which DSC dropped its claims under the Lanham Act and state palming off law, and added a state law claim for unfair competition by misappropriation. The district court instructed the jury in accordance with DSC's proposal, and DGI did not object.

[7]DSC I, 81 F.3d at 599-602.

misappropriated DSC's trade secrets.  The jury also determined that both parties had "unclean hands."

Nine months later, in November 1997, the district court entered its Final Judgment and Permanent Injunction.  Noting that the jury verdict afforded both parties some measure of double recovery, the court awarded DSC $4.3 million in actual damages and $7 million in punitive damages, and awarded DGI $2 million in actual damages and $9 million in punitives — resulting in a set-off judgment of $300,000 for DSC.  The district court dismissed DGI's antitrust claim, stating that DGI had failed to prove the relevant product market under <u>Eastman Kodak Co. v. Image Technical Services, Inc.</u>[8] and that its damages model was "hopelessly flawed." Finally, the court permanently enjoined DGI from developing any new microprocessor cards with the assistance of DSC's operating system software and from selling any other DGI microprocessor card designed to use DSC's software.  The court also ordered DGI to turn over all DMP-2800 microprocessor cards to DSC for destruction, but the court stayed that order pending resolution of this appeal.  DGI timely appealed, and DSC timely cross-appealed.

II

ANALYSIS

A.   <u>DGI's Antitrust Claim</u>

The jury found DSC liable under § 2 of the Sherman Act for monopolization of the expansion and enhancement market for DSC-manufactured switches and awarded DGI $750,000 in lost profits and

_____

[8]504 U.S. 451 (1992).

9

$1.5 million in future lost profits on that claim. The district court overturned this verdict, however, holding that (1) there was insufficient evidence to establish that expansion cards are the relevant market for antitrust purposes, and (2) DGI's damage model was hopelessly flawed.

1. *Standard of Review*

We review the district court's grant of a JML de novo, applying the same standards as those employed by the district court.[9] The district court may grant a motion for a JML only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."[10]

2. *Waiver*

As a preliminary matter, DGI asserts that DSC waived its right to challenge the sufficiency of DGI's antitrust evidence. Although DSC submitted a Rule 50 motion at the close of DGI's case-in-chief, it did not renew this motion after the rebuttal evidence.

"[I]t is well established that a party waives the right to challenge the sufficiency of the evidence with a JNOV unless a motion for directed verdict is made or renewed at the close of all evidence."[11] We have approached this requirement with a "liberal

---

[9]Burch v. Coca-Cola Co., 119 F.3d 305, 313 (5th Cir. 1997), cert. denied, 118 S. Ct. 871 (1998).

[10]Fed. R. Civ. P. 50(a).

[11]McCann v. Texas City Ref., Inc., 984 F.2d 667, 671 (5th Cir. 1993). Of course, under Fed. R. Civ. P. 50, the terms "judgment notwithstanding the verdict" and "directed verdict" have been replaced by "judgment as a matter of law."

10

spirit,"[12] however, and in some circumstances, we have excused technical noncompliance with Rule 50(b) if the deviation is "de minimis."[13]   "Whether technical noncompliance with Rule 50(b) precludes a challenge to the sufficiency of the evidence on appeal 'should be examined in the light of the accomplishment of its particular purposes as well as in the general context of securing a fair trial for all concerned in the quest for truth.'"[14]  We have articulated two purposes for this rule:  "to enable the trial court to re-examine the sufficiency of the evidence as a matter of law if, after verdict, the court must address a motion for judgment as a matter of law, and to alert the opposing party to the insufficiency of his case before being submitted to the jury."[15] Circumstances which have led us to deem a technical violation of Rule 50(b) "de minimis" include, <u>inter alia</u>, (1) the trial court's having reserved a ruling on an earlier motion for a JML made at the close of plaintiff's evidence; (2) the defendant's calling no more than two witnesses before closing; (3) the elapse of only a small amount of time between the motion for a JML and the conclusion of all evidence; and (4) the plaintiff's introducing no rebuttal

---

[12]<u>Davis v. First Nat'l Bank of Killeen, Tex.</u>, 976 F.2d 944, 948 (5th Cir. 1992), <u>cert. denied</u>, 508 U.S. 910 (1993).

[13]<u>MacArthur v. University of Tex. Health Ctr.</u>, 45 F.3d 890, 896 (5th Cir. 1995); <u>McCann v. Texas City Refining, Inc.</u>, 984 F.2d 667, 671 (5th Cir. 1993).

[14]<u>MacArthur</u>, 45 F.3d at 896-97 (quoting <u>Bohrer v. Hanes Corp.</u>, 715 F.2d 213, 217 (5th Cir. 1983), <u>cert. denied</u>, 465 U.S. 1026 (1984)).

[15]<u>Id.</u> at 897.

evidence.[16]

In this case, we perceive no prejudice that would result from waiving technical compliance with Rule 50(b). DSC moved for a JML on DGI's antitrust claim on a Friday afternoon, at the close of DGI's evidence, and the district court specifically reserved ruling on the motion. That same afternoon, DSC called only its antitrust expert witness, Dr. Teece, whose testimony was, of course, favorable to DSC. The parties had the weekend and Monday off, and before resting their cases on Tuesday DSC and DGI called but one additional witness each —— neither of whom testified on antitrust issues. Thus, although three calendar days elapsed between DSC's motion and the close of all evidence, this period was attributable only to the intervening weekend and the district court's need to tend to its criminal docket on Monday. As DGI presented no evidence to shore up its antitrust case after DSC made its JML motion, that motion sufficed under these circumstances to alert DGI to the insufficiency of its case. Furthermore, the district court did not dismiss the antitrust claim until the passage of more than nine months after the end of trial, only then concluding on its own that the evidence was not sufficient to support the jury's verdict.

We hold that DSC did not waive its challenge to the sufficiency of DGI's antitrust evidence by failing to reassert its motion for JML at the close of all the evidence. Having so determined, we now consider DSC's substantive challenges to DGI's

---

[16]McCann, 984 F.2d at 671 (citing Davis, 976 F.2d at 948-49; Merwine v. Board of Trustees, 754 F.2d 631, 634-35 (5th Cir.), cert. denied, 474 U.S. 823 (1985); Bohrer, 715 F.2d at 216-17).

12

case.

*3.   Relevant Market*

"'The offense of monopoly under § 2 of the Sherman Act has two elements:  (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'"[17]  Thus, to prove a monopolization claim, the plaintiff must first establish the relevant product market.[18]  DGI disputes the district court's conclusion that it failed to prove that the "capacity enhancement and expansion products" market for DSC-manufactured switches is the relevant market for antitrust purposes.

As DGI stresses, in determining the relevant product market, "the reality of the marketplace must serve as the lodestar."[19]  DGI advances that market realities dictate that the relevant market in this case is the capacity expansion market. For instance, it asserts that the evidence shows that DSC's officers, employees, customers, and internal documents, as well as DGI's officers, salesmen, and economic experts, defined the relevant market as the

---

[17]Kodak, 504 U.S. at 481 (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)).

[18]General Indus. Corp. v. Hartz Mountain Corp., 810 F.2d 795, 805 (8th Cir. 1987) (noting that the relevant product market is a fact question to be decided by the jury, on which the plaintiff bears the burden of proof).

[19]Id.

market for expansion products.[20]  DGI insists that users of DSC switches are "locked-in" to DSC in the aftermarket.  This assertion is strengthened, it maintains, by the fact that DSC's software license allows its customers to use its copyrighted software only in conjunction with the unpatented DSC hardware.

DGI adds that the district court's reference to Kodak is not apt, and in fact urges that Kodak supports DGI's claim by establishing that aftermarket monopolization is actionable under the Sherman Act.  In that case, defendant Kodak sold plain paper copiers in a market with several rivals.  The Court assumed that, at the time of sale, Kodak sold replacement parts, giving users the option either to repair their copiers or to hire independent service organizations ("ISOs") to do so.  Later, Kodak changed its policy and refused to sell parts to ISOs.  The ISOs alleged that, as Kodak's equipment was unique and its competitors' parts incompatible with Kodak machines, this altered practice allowed Kodak to capture the repair business for itself, at "supra-competitive" prices.[21]  Kodak argued that, "either presumptively or as a matter of law, vigorous competition in the copier market would prevent Kodak from raising its parts and servicing contract prices above competitive levels, because any such price increases in these 'derivative aftermarkets' would become known to copier-equipment

---

[20]See Bon-Ton Stores, Inc. v. May Dep't Stores Co., 881 F. Supp. 860, 873 (W.D.N.Y. 1994) (in the antitrust context, "[o]ne means utilized to determine the relevant product market is to analyze how the competitors themselves view the market.").

[21]Kodak, 504 U.S. at 472.

14

consumers, and eventually cause Kodak to lose ground to its competitors in copier sales."[22]

The Court rejected Kodak's argument, concluding that summary judgment was not appropriate. It reasoned that, at the time of their original copier purchases, some consumers might not have cost-efficient access to pricing information needed to evaluate the total "life-cycle" cost of the entire Kodak package, i.e., the price of the copier, likely replacement parts, and product-lifetime servicing.[23] Likewise, the Court explained that, inasmuch as Kodak's customers found it prohibitively expensive to replace their equipment with another manufacturer's product, they might tolerate some level of aftermarket price increase before changing brands.[24] The Court thus decided that the undetermined "information costs" and "switching costs" represented material issues of fact that precluded summary judgment. DGI argues here that, in a similar manner, DSC could substantially raise its aftermarket card prices before DSC switch owners would consider replacing DSC switches, and that DSC was thus able to maintain supra-competitive prices in the expansion products aftermarket.

DGI's reliance on Kodak is misplaced. As we previously noted in United Farmers Agents Association v. Farmers Insurance

---

[22]Lee v. Life Ins. Co. of N. Am., 23 F.3d 14, 17 (1st Cir.) (citing Kodak, 504 U.S. at 465-67, 469), cert. denied, 513 U.S. 964 (1994).

[23]Id. (citing Kodak, 504 U.S. at 472-77).

[24]Kodak, 504 U.S. at 476.

15

Exchange,[25] "[t]he Supreme Court's decision in Kodak was a rejection of Kodak's assertion that market power could never exist over repair parts in any case where the defendant did not have market power over earlier-purchased machines needing those parts."[26] We pointed out that, "[c]ritically, the plaintiffs in Kodak produced evidence that Kodak was charging above market prices for its service and was engaging in price discrimination in favor of the knowledgeable customers who could most easily obtain information or switch companies."[27] Indeed, the Court in Kodak concluded that "[i]t may be that [Kodak's] parts, service, and equipment are components of one unified market, or that the equipment market does discipline the aftermarkets so that all three are priced competitively overall, or that any anti-competitive effects of Kodak's behavior are outweighed by its competitive effects."[28] The Court simply was not prepared to permit this factual determination to be made at the summary judgment stage.

In contrast to Kodak, the instant case comes to us after a full-blown jury trial. Also unlike Kodak, here there is no evidence that DSC has a superior or unique product that allows it to charge supra-competitive prices. Indeed, although DGI presented testimony that DSC's cards are extremely expensive, it never

_____

[25] 89 F.3d 233 (5th Cir. 1996), cert. denied, 117 S. Ct. 960 (1997).

[26] Id. at 237 (emphasis added).

[27] Id.

[28] Kodak, 504 U.S. at 486.

16

compared DSC's prices to its competitors' prices. And unlike the plaintiffs in Kodak, DGI did not prove that DSC's customers face substantial information and switching costs. To the contrary, the evidence shows that many DSC switch owners engage in life-cycle pricing, that is, they factor in not only the purchase price of the equipment, but also the post-acquisition costs of operation, maintenance, and expansion at the time of purchase. By engaging in life-cycle pricing, a customer links together the primary equipment market and any aftermarket for parts and service for the equipment of particular manufacturers.

And, as noted, DGI did not prove that a change in any of DSC's pricing, warranty, or other policies served to subject DSC switch owners to substantial additional information or switching costs. From the beginning, DSC's licensing agreement for its operating system software authorized its customers to use the software only in conjunction with equipment manufactured by DSC. This was a long-standing policy, not a response to DGI's entry into the market. True, there was some evidence that DSC threatened to cancel its warranties on switches that used equipment not manufactured by DSC. The evidence also shows, however, that despite referring to DGI by name, the letter threatening to void the warranties was sent before DGI ever offered its first product for sale. As DSC was the sole manufacturer of expansion products for DSC switches before DGI entered the market, this alleged change in policy could not substantially increase the information costs for DSC customers; when they purchased the DSC switches, they could

17

not have reasonably expected suppliers of expansion products other than DSC to enter the aftermarket. Several circuits have held that such a change in policy is a crucial factor in establishing an aftermarket monopoly claim. As the Sixth Circuit held, "an antitrust plaintiff cannot succeed on a Kodak-type theory when the defendant has not changed its policy after locking-in some of its customers, and the defendant has been otherwise forthcoming about its pricing structure and service policies."[29]

We agree with the district court's determination that DGI's characterization of the expansion products market as the relevant market is at odds with market realities. The record shows that the prices for two-thirds of all of DSC's cards are set at the time a telephone company purchases a switch, either because the customer purchases the one frame that the switch must have to operate, or through a future or life-cycle pricing scheme negotiated at the time of purchase. DGI's model excludes all these cards from its relevant market, not an insignificant flaw in the model.

Furthermore, DGI's proposed market does not acknowledge that

---

[29]PSI Repair Servs., Inc. v. Honeywell, Inc., 104 F.3d 811, 820 (6th Cir.), cert. denied, 117 S. Ct. 2434 (1997):

> We likewise agree that the change in policy in Kodak was the crucial factor in the Court's decision. By changing its policy after its customers were "locked in," Kodak took advantage of the fact that its customers lacked the information to anticipate this change. Therefore, it was Kodak's own actions that increased its customers' information costs. In our view, this was the evil condemned by the Court and the reason for the Court's extensive discussion of information costs.

See also Digital Equip. Corp. v. Uniq Digital Tech., Inc., 73 F.3d 756, 762 (7th Cir. 1996); Lee, 23 F.3d at 20.

18

the purchase of a new frame with cards is only one of several ways a telephone company can expand its call-handling capacity. For instance, a company can purchase a new switch from DSC or from another switch manufacturer, purchase a used switch from DSC or a broker, or trade for or lease capacity in another company's network. In addition, as many of DSC's customers, such as MCI, are dual-sourced —— that is, they own switches built by more than one manufacturer —— they can purchase a new frame for one of their non-DSC switches. All of these capacity handling options are also omitted from DGI's relevant market.

We are convinced that DGI, like the plaintiff in United Farmers, is "trying to define the market as narrowly as possible (in order to make it look as if [defendant] had market power)."[30] Because (1) DGI did not present legally sufficient evidence that DSC's customers faced significant information and switching costs, and (2) DGI's proffered relevant market does not comport with market realities, its aftermarket monopoly claim fails as a matter of law. As such, the district court did not err in granting DSC's motion for a JML dismissing DGI's antitrust claim.

B.  DSC's State Law Damages Claims

The district court awarded DSC $4.3 million in compensatory damages and $7 million in punitive damages on its Texas state law claims for (1) misappropriation of trade secrets and (2) unfair

---

[30]United Farmers, 89 F.3d at 236.

19

competition.[31]  DGI challenges both grounds on which these damage awards were made.

### 1.  *Misappropriation of Trade Secrets*

The jury found that DGI misappropriated DSC's trade secrets in its operating system software and MP-8 firmware.  DGI asserts that the evidence is legally insufficient to support these claims, so that the district court erred in denying its motion for a JML.  As previously noted, we review a district court's rulings on motions for a JML de novo, using the same standards as did the district court.

Under Texas law, trade secret misappropriation is established by showing: "(a) a trade secret existed; (b) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (c) use of the trade secret without authorization from the plaintiff."[32]  DGI disputes the jury's findings with regard to the second element — that DGI used improper means or the breach of a confidential relationship to appropriate DSC's trade secrets in its operating system software and firmware.

DGI argues first that, as a matter of law, it could not have misappropriated DSC's trade secrets in its firmware.  As DSC and DGI never formed a contractual or confidential relationship, urges DGI, DSC must prove that DGI used "improper means" to

---

[31]At DSC's request, the district court did not award any damages on its federal copyright infringement claim.

[32]Phillips v. Frey, 20 F.3d 623, 627 (5th Cir. 1994).

20

misappropriate its firmware trade secrets.  DGI contends that the firmware was embedded on a chip in every DSC MP-8 card sold, and that it bought a card and analyzed the firmware through "disassembly" — the translation of machine code into human-readable form.  DGI insists that this disassembly does not constitute "improper means," but is a lawful practice.[33]

DGI likewise maintains that, as a matter of law, the evidence was insufficient to show that it misappropriated DSC's operating system software trade secrets.  DGI points out that it was under no contractual obligation to DSC and did not learn of the software by breaching any confidence reposed in it by DSC.  DGI also advances that it did not use improper means to obtain the trade secrets; to the contrary, it insists, a copy of part of the operating system was obtained during a test at the site of NTS, a DSC switch customer with whom DGI had an ongoing relationship.  As NTS gave its permission for DGI to test its cards, concludes DGI, it cannot be liable for trade secret misappropriation.

DSC counters that there was sufficient evidence to support the jury's conclusion that DGI misappropriated its trade secrets in its firmware and operating system software.  As to the firmware, DSC urges that DGI did not use legitimate disassembly or reverse engineering to acquire DSC's trade secrets.  DSC points out that

_____

[33]See Phillips, 20 F.3d at 632; K&G Oil Tool & Serv. Co. v. G&G Fishing Tool Serv., 314 S.W.2d 782, 788 (Tex.), cert. denied, 358 U.S. 898 (1958) ("It is unquestionably lawful for a person to gain possession, through proper means, of his competitor's product and, through inspection and analysis, create a duplicate unless, of course, the item is patented.").

even Jay Gentry, one of DGI's engineers responsible for developing its version of the firmware, testified that DGI would not have been able to understand DSC's firmware if it had not unlawfully obtained a copy of DSC's operating system software. Thus, reasons DSC, DGI used improper means to acquire the trade secrets in DSC's firmware. Similarly, DSC argues that DGI used improper means to obtain DSC's operating system trade secrets. Even though DGI did not have a contractual or confidential relationship with DSC regarding the nondisclosure of the software, NTS did. DSC adduced evidence that DGI misled NTS's employee, Ernie Carrasco, by informing him that it needed to "test" a DGI card, but never told him that it planned to copy and remove DSC's software. As such, DGI duped NTS into breaching its own contract with DSC —— an act which DSC submits constitutes improper means.

Our review of the record satisfies us that there was ample evidence to support the jury's determination that DGI obtained DSC's trade secrets through improper means. In <u>E.I. duPont deNemours & Co. v. Christopher</u>,[34] we stated: "A complete catalogue of improper means is not possible. In general they are means which fall below the generally accepted standards of commercial morality and reasonable conduct."[35] DSC adduced evidence showing that DGI unlawfully made a copy of DSC's operating system software at NTS's place of business by misleading an NTS employee who, at least

---

[34]431 F.2d 1012 (5th Cir. 1970), <u>cert. denied</u>, 400 U.S. 1024 (1971).

[35]<u>Id.</u> at 1016 (quoting Restatement of Torts § 757, comment f at 10 (1939)).

22

inferentially, was particularly susceptible of being hoodwinked because of his moonlighting as a consultant to DGI; and that DGI then used the knowledge it gained from the purloined software to interpret the trade secrets contained in DSC's firmware. As a reasonable jury could have found that such means "fall below the generally accepted standards of commercial morality and reasonable conduct," the district court did not err in denying DGI's motion for a JML on the trade secret claims.

### 2. *Unfair Competition by Misappropriation*

Next, DSC asserted — and the jury found — that DGI's use of DSC's firmware, operating system software, and DSP manuals in developing its own DMP 2800 microprocessor card, DTD card, BT card and PCMI card, constituted misappropriation under the Texas common law of unfair competition. In contending that the district court erred when it denied DGI's motion for a JML, DGI argues that DSC's state law misappropriation action is preempted by federal copyright law. We agree.

With a few exceptions, all causes of action falling within the scope of the Copyright Act are expressly preempted.[36] Section 301 of the Act[37] sets forth two conditions, both of which must be

---

[36]Daboub v. Gibbons, 42 F.3d 285, 288 (5th Cir. 1995).

[37]17 U.S.C. § 301 provides:
(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and

23

satisfied, for preemption of a right under state law to occur:

First, the work in which the right is asserted must come within the

subject matter of copyright as defined in sections 102[38] and 103.[39]

---

whether published or unpublished, are governed exclusively by this title.  Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.
(b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to ——
        (1) subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103, including works or authorship not fixed in any tangible medium of expression; or . . .
        (3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 . . . .

[38]17 U.S.C. § 102 provides:
    (a) Copyright protection subsists, in accordance  with this title, in original works of authorship  fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.  Works of authorship include the following categories:
    (1) literary works;
    (2) musical works, including any accompanying words;
    (3) dramatic works, including any accompanying music;
    (4) pantomimes and choreographic works;
    (5) pictorial, graphic, and sculptural works;
    (6) motion pictures and other audiovisual works;
    (7) sound recordings; and
    (8) architectural works.
(b) In no case does copyright protection for any original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

[39]17 U.S.C. § 103 provides:
    (a) The subject matter of copyright as specified by section 102 includes compilations and derivative works, but protection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has

24

Second, the right that the author seeks to protect must be underlined equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.[40]

We begin our analysis under the first prong by noting that the Copyright Act protects expression, not facts.[41] A compilation of facts is not entitled to copyright protection unless the compilation itself possesses some degree of originality.[42] Moreover, even if a compilation is original by virtue of the

been used unlawfully.

(b) The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.

[40]17 U.S.C. § 106 provides:
Subject to sections 107 through 120, the owner of a copyright under this title has the exclusive rights to do and to authorize any of the following:
(1) to reproduce the copyrighted work in copies or phonorecords;
(2) to prepare derivative works based upon the copyrighted work;
(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and
(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

[41]Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 356 (1991). 17 U.S.C. § 102(b) is "universally understood to prohibit any copyright in facts." Id.

[42]Id. at 348.

selection or arrangement of its component facts, the copyright is limited to that selection or arrangement and does not extend to the information contained in it.[43]

DSC rejects preemption of its misappropriation claim based on these fundamental principles. In the instant case, contends DSC, DGI's offense was not the use of DSC's firmware, software, and manuals, but rather the use of <u>uncopyrightable information</u> —— presumably facts[44] —— contained within these copyrightable works. This assertion is belied by the fact that DSC has consistently framed its misappropriation count in the context of DGI's use of its <u>firmware</u>, <u>operating system software</u> and <u>DSP manuals</u>. Without objection, the district court instructed the jury on DGI's use of these <u>works</u>, and not specific pieces of information contained in them. In response, the jury found that DGI had impermissibly relied on DSC's firmware, software, and manuals in developing its competing microprocessor and expansion cards. Because the jury also found DSC to be the owner of copyrights in these works, these works, by definition, "come within the subject matter of copyright." Consequently, we conclude, the first prong of the preemption analysis is satisfied.

The second prong is more complex, however, requiring a comparison of the nature of the rights protected under federal copyright law with the nature of the state rights for which DSC

---

[43]<u>Id.</u>

[44]DSC fails to identify the nature of the "information" used by DGI, but nevertheless maintains that this information falls outside the scope of copyright protection.

26

seeks protection. If these rights are determined to be "equivalent," then the state law cause of action is preempted. We evaluate the equivalency of rights under what is commonly referred to as the "extra element" test.[45] According to this test, if the act or acts of DGI about which DSC complains would violate both misappropriation law and copyright law, then the state right is deemed "equivalent to copyright."[46] If, however, one or more qualitatively different elements are required to constitute the state-created cause of action being asserted, then the right granted under state law does not lie "within the general scope of copyright," and preemption does not occur.[47]

The purpose of copyright law is to promote and protect creativity.[48] For a work to qualify for copyright protection, it must be original.[49] And originality, as the term is used in copyright, requires both "independent creation" and "a modicum of creativity."[50]

---

[45]National Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 850 (2d Cir. 1997).

[46]Id.; 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 1.01[B][1], at 1-13 (1998).

[47]1 Nimmer, supra, § 1.01[B][1], at 1-13.

[48]Twentieth Century Music Corp. v. Aiken, 422 U.S. 151, 156 (1975)(stating that the basic purpose of the Copyright Act is "to stimulate artistic creativity for the general public good"); Feist, 499 U.S. at 349 (noting that "[t]he primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts'" (quoting U.S. Const. art. I, § 8, cl. 8)); Kelly A. Ryan, Copyright Law: Do State Misappropriation Rights Survive Feist Publications Copyright Laws?, 1992/1993 Ann. Surv. Am. L. 329, 329 (1994).

[49]Feist, 499 U.S. at 345.

[50]Id. at 346.

The requisite level of creativity is extremely low.[51] Nevertheless, without some creative spark — "no matter how crude, humble or obvious"[52] — the labor that goes into independently creating (as opposed to simply reproducing) a work is insufficient to bring that work within the scope of copyright.[53] And, if a work is entitled to copyright protection, its author is granted exclusive rights over its reproduction,[54] adaptation,[55] distribution,[56] performance, and display. Use of a copyrighted work by one who does not own the copyright

_____

[51]Id. at 345.

[52]Id.

[53]See generally Feist, 499 U.S. 340 (holding that alphabetized telephone white pages lacked the creative spark required by the Copyright Act and the Constitution, and, therefore, were not entitled to copyright protection despite the hard work that went into compiling the facts contained in the directory).

[54]The reproduction right consists of the exclusive right "to reproduce the copyrighted work in copies or phonorecords." 17 U.S.C. § 106(1). "Copies" and "phonorecords" consist of material objects in which the work is fixed. 2 Nimmer, supra, § 8.02[B][2], at 8-29, 30. One who makes copies of a copyrighted work infringes the copyright owner's reproduction right even if he does not also infringe the distribution right by sale or other disposition of such copies. 2 id., § 8.02[C], at 8-31, 32. Therefore, subject to certain exemptions, copyright infringement occurs whenever an unauthorized copy is made, even if it is used solely for the private purposes of the reproducer. 2 id., at 8-32.

[55]Section 106(2) of the Copyright Act grants to the copyright owner the exclusive right "to prepare derivative works based upon the copyrighted work." In order to violate clause (2), the infringing work must incorporate a sufficient portion of the pre-existing work so as to constitute an infringement of either the reproduction right, or of the performance right. 2 Nimmer, supra, § 8.09[A], at 8-128. To be actionable, the finished product must be "substantially similar" to its forbear. 2 id.

[56]Section 106(3) of the Copyright Act accords to the copyright owner the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership or by rental, lease, or lending. . . ."

constitutes infringement under federal law,[57] provided the use falls within the scope of a copyright owner's exclusive rights.[58]

In contrast to federal copyright law, which focuses on the value of creativity, state misappropriation law is specifically designed to protect the <u>labor</u> —— the so-called "sweat equity" —— that goes into creating a work.[59]  This purpose is evident in the elements of proof

_____

[57]The two fundamental elements of a copyright infringement claim under the federal Copyright Act are:
>    (1) ownership of a valid copyright by the plaintiff; and
>    (2)  copying,  by  the  defendant,  of  constituent elements of the plaintiff's work that are original.
<u>Feist</u>, 499 U.S. at 361; <u>Allied Mktg. Group, Inc. v. CDL Mktg., Inc.</u>, 878 F.2d 806, 810 (5th Cir. 1989).

[58]17 U.S.C. § 501(a).  "Use" other than reproduction, adaptation, distribution, performance, and display does not amount to "copying" under the Copyright Act, and is not, therefore, actionable under federal law.  2 Nimmer, <u>supra</u>, § 8.01[A], at 8-13, 14.  <u>See, e.g.</u>, <u>G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., Inc.</u>, 958 F.2d 896, 904 (9th Cir. 1992)(implicitly holding that the interest for which plaintiff sought protection under state law —— the "use" of its Supplemental Type Certificate as a basis for obtaining an airworthiness certificate from the FAA —— fell outside the scope of the exclusive rights granted under federal copyright law, and plaintiff's state claim was not, therefore, preempted).

[59]<u>See</u> <u>International News Serv. v. Associated Press</u>, 248 U.S. 215, 239 (1918).  Misappropriation is the act of converting to one's own use and profit the product of another's labor.  <u>See</u> <u>id.</u>
The doctrine of unfair competition by misappropriation was established by the Supreme Court in <u>International News Service v. Associated Press</u>.  In that case, INS copied AP news reports printed in the eastern U.S., and transmitted them to subscribers in the western U.S.  INS used the copied information to compete against AP for  a  West  Coast  clientele.  While  AP's  articles  were copyrightable, the underlying news events were not.  Concluding that INS's behavior was inequitable, the Court established the misappropriation doctrine to prevent INS from unjustly benefitting from AP's labor.  <u>Id.</u> at 239.  The Court noted that it was not the news events themselves which were being protected by the doctrine, but rather the proprietor's effort and expense in obtaining them. <u>Id.</u> at 240.
<u>International News</u> was decided pre-<u>Erie</u> as a matter of federal

29

required to succeed under a Texas misappropriation claim. These elements, as articulated by the Texas Court of Appeals in United States Sporting Products, Inc. v. Johnny Stewart Game Calls, Inc.,[60] include:

> (i) the creation by plaintiff of a product through extensive time, labor, skill and money; (ii) the use of that product by defendant in competition with plaintiff, thereby giving the defendant a special competitive advantage because he was burdened with little or none of the expense incurred by plaintiff in the creation of the product; and (iii) commercial damage to plaintiff.[61]

Despite the seemingly divergent purposes of federal copyright law and state misappropriation law, we conclude that, under the discrete facts of this case, the rights protected under these laws are equivalent.

This conclusion is supported by our holding in Daboub v. Gibbons.[62] Daboub involved the performance by the band ZZ Top of music that the plaintiffs alleged originally belonged to them. The complained-of acts centered around ZZ Top's live performances and

---

common law, and thus nowhere is binding precedent. The case spawned the development of unfair competition laws throughout the states, however, including Texas. See Gilmore v. Sammons, 269 S.W. 861, 863 (Tex. Civ. App. 1925)(concluding that a common-law property interest exists "in facts and information collected and utilized by skill, labor, and expense, although the same information is available to any one who chooses to collect it," and adopting the International News misappropriation doctrine as a remedy for defendant's appropriation of news items gathered by plaintiff's effort at his great expense).

[60]865 S.W.2d 214 (Tex. App. 1993, writ denied).

[61]Id. at 218.

[62]42 F.3d 285 (5th Cir. 1995).

sales of studio recordings of this music.[63] Plaintiffs brought suit alleging various Texas state law claims, including misappropriation, but we held that plaintiffs' state claims were preempted by the Copyright Act. In so doing, we stated that "[plaintiffs'] state claims center on the improper copying of the song, an interest clearly protected by the Copyright Act. . . . The core of each of [their] state law theories of recovery . . ., without detailing the specific elements comprising each claim, is the same: the wrongful copying, distribution, and performance of the lyrics of Thunderbird."[64] We held that the state claims were preempted because plaintiffs had failed to "allege or produce evidence of 'any element, such as an invasion of personal rights or a breach of fiduciary duty',"[65] which would have rendered their claims different in kind from copyright infringement.

Likewise, the acts that form the basis of DSC's misappropriation claim touch on interests clearly protected by the Copyright Act, including (1) the reproduction of its firmware, software, and manuals; (2) the use of these materials in the preparation of allegedly derivative works — DGI's microprocessor and expansion cards; and (3) the distribution of these works in competition with DSC. Nevertheless, DSC insists, its claim is not preempted because Texas misappropriation law requires proof of

---

[63]Id. at 287.

[64]Id. at 289.

[65]Id. at 289-90 (quoting P.I.T.S. Films v. Laconis, 588 F. Supp. 1383 (E.D. Mich. 1984)).

elements qualitatively different from those necessary to establish copyright infringement.

First, submits DSC, state law requires proof that DSC's product was created through "extensive time, labor, skill and money" whereas, under the Copyright Act, this proof is irrelevant. As previously noted, however, copyright protection is awarded only to those works in which independent creation and creativity converge. DSC is correct in its observation that no amount of time, labor, skill, and money can bestow copyright eligibility on a work that is devoid of creativity. While proof of these elements is not <u>sufficient</u> to establish copyright protection, however, these elements are fundamental to the independent creation of a work, proof of which is <u>necessary</u> under the Copyright Act. Thus, under circumstances in which a work has been granted copyright protection — such as the circumstances that are before us in the instant case — the time, labor, skill, and money expended by the author in creating the work are necessarily contemplated in that copyright.

Next, submits DSC, a Texas misappropriation claim requires proof that DGI used DSC's firmware, software, and manuals "in competition with" DSC. Because an unauthorized act of reproduction would violate copyright law but would not, in itself, offend the competition requirement of state law, DSC argues, its misappropriation claim is qualitatively different. This type of reverse reasoning defies logic. The owner of a copyright has a claim under federal law for the infringement of his exclusive rights to reproduce, adapt, distribute, perform, and display his

32

works. Whether the infringing act touches on all of these rights or just one is irrelevant for the purposes of copyright law. In the instant case, alleges DSC, DGI reproduced works created by DSC, prepared derivative works based on those creations, and then distributed its product in competition with DSC. To establish a claim under state law, proof of this final infringing act is necessary. Although not necessary, such proof is sufficient to establish a claim under federal copyright. That proof of reproduction would, in itself, be sufficient to establish a copyright claim as well means only that the scope of protection afforded by copyright law is broader than that afforded by state misappropriation.

We conclude that, because DSC has failed to demonstrate the presence of any element that renders different in kind its rights under state and federal law, DSC's state misappropriation claim is preempted by federal copyright law. Consequently, the district court erred in denying DGI's motion for a JML on this issue, and its award of damages on DSC's claim of unfair competition by misappropriation must be vacated. Unfortunately, however, the monetary damages awarded to DSC were not itemized, and we have no way of parsing that award to reduce its quantum appropriately and render it. Therefore, we have no choice but to remand this particular issue to the district court for it to recalculate the damages in accordance with this opinion and render a revised judgment accordingly.

C.  Injunction

33

The jury found, and the district court agreed, that as a result of DGI's trade secret misappropriation, unfair competition by misappropriation, and copyright infringement DSC would be irreparably harmed in the future with respect to its operating system software.  The court therefore issued a permanent injunction (1) requiring DGI to produce for destruction all of its existing microprocessor cards, and (2) prohibiting DGI from selling any microprocessor cards developed with the assistance of DSC's operating system software or designed to use DSC's operating system software.  DGI urges that none of the grounds relied on by the district court justify the issuance of the injunction.  We address each of these grounds in turn, reviewing the underlying claims and the reasons proffered by DGI for its contention that equitable relief was improper.

*1.  Standard of Review*

We review a district court's issuance of a permanent injunction for abuse of discretion.[66]  A district court abuses its discretion if it "(1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction[,] (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief."[67]

---

[66]Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1389 (5th Cir. 1996).

[67]Peaches Entertainment Corp. v. Entertainment Repertoire Assocs., 62 F.3d 690, 693 (5th Cir. 1995).

34

*2.  Copyright Infringement*[68]

    a.  Sufficiency of the Evidence

The jury found that DGI <u>directly</u> infringed DSC's copyrights in its pulse code modulation interface manual and printed circuit board assembly, its MP-8 firmware, and its operating system software.  The jury also concluded that DGI had not <u>contributorily</u> infringed DSC's copyright in its operating system software.

To succeed on a claim for direct copyright infringement, a plaintiff must prove two elements:  (1) ownership of the copyrighted material and (2) copying by the defendant.[69]  A copy is legally actionable if (1) the alleged infringer actually used the copyrighted material to create his own work, and (2) substantial similarity exists between the two works.[70]  A party is liable for contributory infringement when it, "with knowledge of the infringing activity, induces, causes or materially contributes to infringing conduct of another."[71]  Section 502 of the Copyright Act authorizes the district court to grant "final injunctions on such terms as it may deem reasonable to prevent or restrain infringement

---

[68]DSC did not seek damages, but solely injunctive relief, for its copyright infringement claim.

[69]<u>Allied Mktg. Group, Inc. v. CDL Mktg., Inc.</u>, 878 F.2d 806, 810 (5th Cir. 1989).

[70]<u>Engineering Dynamics, Inc. v. Structural Software, Inc.</u>, 26 F.3d 1335, 1340-41 (5th Cir. 1994), <u>opinion supplemented on denial of rehearing</u>, 46 F.3d 408 (5th Cir. 1995).

[71]<u>Gershwin Publishing Corp. v. Columbia Artists Management, Inc.</u>, 443 F.2d 1159, 1162 (2d Cir. 1971) (footnote omitted).

of a copyright."[72]  Likewise, section 503 provides that the court may impound and destroy any articles used to make infringing copies of a copyrighted material.[73]

Regarding direct copyright infringement, DGI argues that the district court's injunction prohibiting the manufacture, sale and development of competing microprocessor cards is not justified by any such act.  DGI first maintains that its competing microprocessor cards do not directly infringe DSC's operating system software copyright, as the DMP-2800 card contains no form of DSC's operating system software when sold to a customer.  In addition, DGI submits that the cards do not directly infringe DSC's firmware copyright, inasmuch as the firmware contained in DGI's DMP-2800 cards is not substantially similar to DSC's firmware.  Accordingly, DGI posits, the district court must have based its injunction on the theory that DGI developed its card with the benefit of earlier infringement of DSC's copyrights.  DGI urges that, as we have previously rejected such a "fruit of the infringing tree" doctrine, the district court abused its discretion in enjoining DGI from continuing to produce a non-infringing product, even if DGI is guilty of past copyright infringement.[74]

---

[72]17 U.S.C. § 502(a) (1994).

[73]17 U.S.C. § 503(a)-(b).

[74]See Kepner-Tregoe, Inc. v. Leadership Software, Inc., 12 F.3d 527, 538 (5th Cir.), cert. denied, 513 U.S. 820 (1994).  In Kepner-Tregoe, the defendant appealed the district court's order enjoining not only its infringing product, but also "all future modifications and revisions."  This court rejected the last portion of the injunction, holding that "the most [the district court] could enjoin were future modifications and improvements of the

36

DGI likewise argues that the district court erred in ignoring the jury's finding that DGI's microprocessor cards do not contributorily infringe on DSC's copyright in its operating system software.

DSC responds that the district court did not abuse its discretion in issuing the injunction based in part on DGI's acts of copyright infringement. In addition to its assertion that the jury's finding of direct infringement is supported by the evidence, DSC advances that the injunction was also justified on the ground of contributory infringement. Towards this end, DSC notes the undisputed fact that its operating system is subject to a valid copyright, that DGI's microprocessor card downloads, i.e., reproduces, that system each time it is booted up, and that DGI intentionally designed its card to perform this infringing function. Furthermore, observes DSC, there is evidence in the record that DGI could have developed its own computer code to operate its card, but realized that copying DSC's system was faster and cheaper. Even though the jury found evidence of contributory infringement — specifically, that DSC's customers infringed DSC's software copyright by using DGI cards, and that DGI knowingly induced this infringing activity — the jury went on to conclude that there was no contributory infringement. This finding, urges DSC, is internally inconsistent, and the district court properly disregarded the jury's finding of no contributory infringement.

_____

[defendant's product] that are substantially similar to [the plaintiff's] copyrighted Materials." Id.

We have no problem upholding the district court's injunction on the basis of DGI's copyright infringement. There is no question that DGI engaged in at least one act of direct copyright infringement: None dispute that DGI personnel connected a laptop computer to the DSC switch at NTS, made a copy of the DSC operating system software, and carried the laptop back to the DGI labs. This unauthorized act clearly infringed DSC's exclusive right to reproduce its software.[75]

We also agree with DSC and the district court that DGI engaged in contributory infringement as a matter of law. The evidence shows that each time a DGI microprocessor card is booted up, it downloads (makes a copy of) the DSC operating system. By selling its DMP-2800 card, therefore, DGI knowingly induces and causes its customers — i.e., DSC switch owners — to violate DSC's exclusive right to reproduce its software. Under section 117 of the Copyright Act, DGI could have avoided liability for contributory infringement by proving that its customers <u>owned</u> copies of the DSC operating system software, and were therefore <u>authorized</u> to make additional copies, provided such reproduction was "an essential

---

[75]<u>Vault Corp. v. Quaid Software Ltd.</u>, 847 F.2d 255, 259 (5th Cir. 1988)(noting that the Copyright Act was amended in 1976 "to include computer programs in the definition of protectable literary works and to establish that a program copied into a computer's memory constitutes a reproduction"); <u>Central Point Software, Inc. v. Nugent</u>, 903 F. Supp. 1057, 1059-60 (E.D. Tex. 1995)(recognizing that "[p]laintiffs may establish copying if they can demonstrate that the software has been reproduced in a computer's memory without permission").

step in the utilization of the computer program."[76]  In a specific interrogatory, however, the jury found that DGI did not prove by a preponderance of the evidence that DSC switch owners owned[77] copies of DSC software.[78]  In light of this finding — which was unappealed

[76]17 U.S.C. § 117 provides an exception to a copyright owner's exclusive rights in computer programs.  It states:

> Notwithstanding the provisions of section 106, it is not infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:
>
> (1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner, or
> (2) that such new copy of adaptation is for archival purposes only and that all archival copies are destroyed in the event that continued possession of the computer program should cease to be rightful. . . .

(Emphasis added).

[77]We are aware of opinions by this court and others in which the reproduction of computer programs by licensees has been held to come within the § 117 exception.  See Vault Corp. v. Quaid Software Ltd., 847 F.2d 255, 261 (5th Cir. 1988)(holding in the context of direct infringement that defendant's complained-of copy was "created as an essential step in the utilization of [plaintiff's] computer program," and that defendant did not infringe plaintiff's exclusive right to reproduce the program, despite the fact that defendant did not use the complained-of copy for its intended purpose, and without explaining why the defendant "owned a copy of the computer program" from which the complained-of copy was made); DSC Communications Corp. v. Pulse Communications Inc., 976 F. Supp. 359, 363 (E.D. Va. 1997)(concluding that "[i]t would be nonsensical" to give licensees — customers of a telecommunications switching system — the right, under the non-exclusive rights clause of their licensing agreement, to buy equipment from a second source, but prevent the licensees from using this equipment — which temporarily downloaded software into its memory — under the threat of an infringement claim). Because DGI did not appeal the jury's finding of non-ownership in the instant case, however, we save for another day the task of defining the contours of the term "owner" as it is used in § 117.

[78]This finding is supported by undisputed evidence that the DSC licensing agreement prohibits DSC switch owners from (1) using the

39

— the jury's conclusion that DGI did not contributorily infringe DSC's software copyright is internally inconsistent. Considering the complex nature of this case and this issue, we understand and sympathize with the jury's confusion on this point. We have previously recognized, though, that when facts are undisputed, we may set aside a jury's finding concerning the legal significance of those facts.[79]

DGI's reliance on Kepner-Tregoe is also unavailing. As DSC reminds us, that case involved a claim of direct infringement. Here, the district court's injunction can be upheld solely on the basis of contributory infringement. As such, the injunctive relief is grounded not in some earlier act of infringement by DGI, but in the recognition that DGI and its customers are violating the DSC software licensing agreement each time they boot up the DSC operating system into a DGI microprocessor card.

b.    Copyright Misuse

DGI nevertheless insists that, even assuming that it committed acts of copyright infringement, the "copyright misuse" doctrine precludes injunctive relief based on that infringement. This doctrine — which has its historical roots in the unclean hands defense[80] — "bars a culpable plaintiff from prevailing on an action

---

software in conjunction with products manufactured by other companies, and (2) making copies of the software or disclosing it to third parties.

[79]See Kiff v. Travelers Ins. Co., 402 F.2d 129, 131 (5th Cir. 1968).

[80]Qad, Inc. v. ALN Assocs., Inc., 974 F.2d 834, 836 (7th Cir. 1992); Supermarket of Homes, Inc. v. San Fernando Valley Bd. of

for the infringement of the misused copyright."[81]  It "forbids the use of the [copyright] to secure an exclusive right or limited monopoly not granted by the [Copyright] Office and which it is contrary to public policy to grant."[82]  The copyright misuse defense is analogous to the patent misuse defense, which was originally recognized by the Supreme Court in Morton Salt Co. v. G.S. Suppiger.[83]  The Fourth Circuit was the first to extend the rationale behind patent misuse to copyrights.  In Lasercomb America, Inc. v. Reynolds, the Fourth Circuit explained that, whereas "copyright law [seeks] to increase the store of human knowledge and arts by rewarding . . . authors with the exclusive rights to their works for a limited time . . . , the granted

---

Homes, 786 F.2d 1400, 1408 (9th Cir. 1986).

[81]Lasercomb Am., Inc. v. Reynolds, 911 F.2d 970, 972 (4th Cir. 1990).  A finding of misuse does not, however, invalidate plaintiff's copyright.  Indeed, the court in Lasercomb specified that "[plaintiff] is free to bring a suit for infringement once it has purged itself of the misuse."  Id. at 979 n.22.

[82]Id.

[83]314 U.S. 488 (1942).  In Morton,

> the plaintiff Morton Salt brought suit on the basis that the defendant had infringed upon Morton's patent in a salt-depositing machine.  The salt tablets that the machine deposited were not themselves a patented item, but Morton's patent license required that licensees use only salt tablets produced by Morton.  Morton was thereby using its patent to restrain competition in the sale of an item that was not within the scope of the patent's privilege.  The Supreme Court held that, as a court of equity, it would not aid Morton in protecting its patent when Morton was using that patent in a manner contrary to public policy.

DSC I, 81 F.3d at 601.

41

monopoly power does not extend to property not covered by the . . . copyright."[84]

We recognized the copyright misuse defense in DSC I.[85] We noted that "DSC seems to be attempting to use its copyright to obtain a patent-like monopoly over unpatented microprocessor cards."[86] Speculating that DGI might prevail on a copyright misuse defense, we refused to expand the preliminary injunction issued by the district court.

Not surprisingly, DGI argues, based on DSC I, that on remand the district court abused its discretion when it ignored the jury's finding that DSC misused its operating system copyright and entered the permanent injunction. DGI reasons that, as DSC's software is licensed to customers to be used only in conjunction with DSC-manufactured hardware, DSC indirectly seeks to obtain patent-like protection of its hardware — its microprocessor card — through the enforcement of its software copyright. DSC responds that its actions do not constitute misuse, inasmuch as its licensing agreement does not prohibit the independent development of compatible operating system software. As DSC points out, it was this "attempt[] to suppress any attempt by the licensee to independently implement" competing software that the court

---

[84]911 F.2d at 976.

[85]See 81 F.3d at 601 ("We concur with the Fourth Circuit's characterization of the copyright misuse defense."). We recognize, however, that pronouncements made during resolution of an appeal of a preliminary injunction are not binding. University of Texas v. Camenisch, 451 U.S. 390 (1981).

[86]Id. (emphasis added).

condemned in Lasercomb.[87]

We agree with the DSC I panel's conjecture and the jury's finding that DSC's licensing agreement for its operating system constitutes misuse. The district court instructed the jury, in pertinent part:

> [I]f DSC has used its copyrights to indirectly gain commercial control over products DSC does not have copyrighted, then copyright misuse may be present. The grant to the author of the special privilege of a copyright carries out a public policy adopted by the Constitution and laws of the United States, "to promote the Progress of Science and useful arts, by securing for limited Times to [Authors] . . . the exclusive Right . . ." to their "original" works. United States Constitution, Art. I, § 8, cl. 8, 17 U.S.C. § 102. But the public policy which includes original works within the granted monopoly excludes from it all that is not embraced in the original expression. It equally forbids the use of the copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office and which is contrary to public policy to grant.

A reasonable juror could conclude, based on the licensing agreement, that "DSC has used its copyrights to indirectly gain commercial control over products DSC does not have copyrighted," namely, its microprocessor cards. The facts on which we based our misuse prediction in DSC I have not changed substantially. As we reasoned then:

> Any competing microprocessor card developed for use on DSC phone switches must be compatible with DSC's copyrighted operating system software. In order to ensure that its card is compatible, a competitor such as

---

[87]Lasercomb, 911 F.2d at 978; see also Triad Sys. Corp. v. Southeastern Express Co., 64 F.3d 1330, 1337 (9th Cir. 1995) (finding that Southeastern was not likely to prevail on copyright misuse defense because in that case, "unlike the case of [Lasercomb], Triad did not attempt to prohibit Southeastern or any other ISO from developing its own service software to compete with Triad."), cert. denied, 516 U.S. 1145 (1996).

43

> DGI must test the card on a DSC phone switch.  Such a test necessarily involves making a copy of DSC's copyrighted operating system, which copy is downloaded into the card's memory when the card is booted up.  If DSC is allowed to prevent such copying, then it can prevent anyone from developing a competing microprocessor card, even though it has not patented the card.

Under these facts, DSC's assertion that its licensing agreement does not prohibit the independent development of compatible software is simply irrelevant.  Despite the presence of some evidence —— the testimony of a DSC executive —— that DGI could have developed its own software, there was also evidence that it was not technically feasible to use a non-DSC operating system because the switch has a "common control" scheme in which each microprocessor card in a network of such cards runs the same operating system.  Hence, without the freedom to test its cards in conjunction with DSC's software, DGI was effectively prevented from developing its product, thereby securing for DSC a limited monopoly over its uncopyrighted microprocessor cards.  Furthermore, the jury instructions never mentioned that misuse could only be present if DSC's agreement prohibited the independent development of software.  Consequently, we conclude that the district court abused its discretion in awarding injunctive relief based on DGI's infringing acts.

We reach this conclusion despite the jury's finding that DGI acted with unclean hands in its acquisition and use of DSC's copyrighted software, firmware, and manuals.  DSC insists that, based on this finding, DGI is barred from invoking an equitable defense, and DSC is entitled to injunctive relief notwithstanding

44

its alleged copyright misuse. We reject this contention.

"It is old hat that a court called upon to do equity should always consider whether the petitioning party has acted . . . with unclean hands."[88] In <u>Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.</u>,[89] the Supreme Court proclaimed that "one tainted with inequitableness or bad faith relative to the matter in which he seeks relief" is barred from a court of equity, "<u>however improper may have been the behavior of the defendant</u>."[90] In the instant case, it is DSC which seeks equitable relief in the form of an injunction, and thus it is DSC's hands alone that must pass the hygenic test. By misusing its software copyright, DSC sullied its hands,[91] barring itself from obtaining the equitable reward of injunction on grounds of copyright infringement. This does not mean that we repudiate the jury's finding of unclean hands on the part of DGI. Indeed, the deceptive practices used by DGI to obtain a copy of DSC's software left it with very dirty mitts. Nevertheless, this finding is irrelevant given the particular

---

[88]<u>Texaco Puerto Rico, Inc. v. Department of Consumer Affairs</u>, 60 F.3d 867, 880 (1st Cir. 1995). This consideration is rooted in the maxim that "he who comes into equity must come with clean hands." <u>Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.</u>, 324 U.S. 806, 814 (1945).

[89]324 U.S. 806 (1945).

[90](Emphasis added). <u>Precision Instrument</u>, 324 U.S. at 814. Later, the Court added, "[t]hat the actions of [defendants] may have been more reprehensible is immaterial." <u>Id.</u> at 819.

[91]Although perhaps not indelibly so. <u>See</u> <u>Lasercomb</u>, 911 F.2d at 979 n.22.

posture of this case.[92]

In support of its contrary position, DSC relies on the Federal Circuit's decision in <u>Atari Games Corp. v. Nintendo of America, Inc.</u>.[93] In that case, the court held that the misuse defense is an equitable doctrine, and that Atari was ineligible to assert that defense because of its unclean hands.[94] The <u>Atari</u> court cited <u>Supermarket of Homes, Inc. v. San Fernando Valley Board of Realtors</u>[95] in support of this conclusion. As DGI points out, however, <u>Supermarket</u> does not stand for the proposition that unclean hands preclude the copyright misuse defense.[96] Although a

_____

[92]<u>See</u> <u>United Cities Gas Co. v. Brock Exploration Co.</u>, 995 F. Supp. 1294, 1296 n.11 (D. Kan. 1998)(citing <u>Precision Instrument</u> for the proposition that "[i]f the plaintiff has unclean hands and seeks equitable relief, the defendant's own improper behavior serves as no bar to its equitable defenses." But, finding support in the historical courts of equity for the proposition that "[i]f . . . the plaintiff has no unclean hands or requests exclusively legal relief, the defendant's unclean hands may preclude it from advancing equitable defenses."). <u>See also</u> <u>Minnesota Muskies, Inc. v. Hudson</u>, 294 F. Supp. 979, 989 (M.D. N.C. 1969)(holding, in action to enjoin professional basketball player from playing ball for any team other than plaintiff, that "[i]t is irrelevant that the conduct of [defendant] may have been more reprehensible than that of [plaintiff], since it is the devious conduct of the [plaintiff] that created the problems presented in this litigation."); <u>MAS v. Coca-Cola Co.</u>, 163 F.2d 505, 510 (4th Cir. 1947)(concluding that, based on the Supreme Court's statement in <u>Precision Instrument</u>, plaintiff's contention that he was entitled to relief notwithstanding his fraudulent conduct because defendant was also guilty of fraud and unlawful conduct was without merit).

[93]975 F.2d 832, 846 (Fed. Cir. 1992).

[94]<u>Id.</u> at 846. <u>Atari</u> was a consolidated case primarily involving Nintendo's claims against Atari for copyright infringement. <u>Id.</u> at 835.

[95]786 F.2d 1400, 1408 (9th Cir. 1986).

[96]<u>Supermarket</u> recognized copyright misuse as a form of the unclean hands doctrine, and its viability as a defense, but held a

smattering of other courts have proposed this type of bar to the use of an equitable defense,[97] we find these decisions unpersuasive. Consequently, we conclude that the district court abused its discretion in failing to allow DGI to invoke the equitable defense of copyright misuse.

### 3.  *Trade Secret Misappropriation*

After finding that DGI misappropriated DSC's trade secrets, the jury nevertheless found that DSC had "unclean hands" in the assertion of those trade secrets in its firmware, operating system software, and written manuals.  DGI would have us find that the district court abused its discretion in granting an injunction to DSC based on DGI's misappropriation of trade secrets as, under Texas law, a plaintiff with unclean hands is not entitled to equitable relief.[98]

---

that none of plaintiff's alleged conduct constituted misuse.  In reference to Supermarket, the Atari court stated that "[t]he Ninth Circuit has noted that the doctrine of unclean hands can also preclude the defense of copyright misuse."  Atari, 975 F.2d at 846. Contrary to the Atari court's reading of the case, Supermarket does not appear to stand for this proposition.

[97]See Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1170 n.43 (1st Cir. 1994)(stating that "[i]f copyright misuse is an equitable defense, a defendant that has itself acted inequitably may not be entitled to raise such a defense."); Leo Feist, Inc. v. Young, 138 F.2d 972 (7th Cir. 1943); Tempo Music, Inc. v. International Good Music, Inc., 143 U.S.P.Q. 67 (W.D. Wash. 1964).  See also 4 Nimmer, supra, § 13.09[B], at 13-295 (citing the above listed cases and suggesting that the defense of unclean hands should possibly be denied "when the defendant has been guilty of conduct more unconscionable and unworthy than the plaintiff's.").

[98]See Regional Properties, Inc. v. Financial & Real Estate Consulting Co., 752 F.2d 178, 183 (5th Cir. 1985); DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 682 n.6 (Tex. 1990), cert. denied, 498 U.S. 1048 (1991).

47

As a preliminary matter, DGI insists that the district court erred in suggesting that the jury's finding was not binding, but was only "an advisory recommendation on the issue of equitable relief." DGI acknowledges that district courts sometime have discretion to disregard findings of unclean hands,[99] but argues that once the court submits the question to a nonadvisory jury, it relinquishes that discretion.

On this point of law, we agree with DGI. Fed. R. Civ. Proc. 39(c) provides that "[i]n all actions not triable of right by a jury the court upon motion or of its own initiative may try an issue with an advisory jury or . . . the court, with consent of both parties, may order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right." It is well established that the right to trial by jury does not extend to matters historically cognizable in equity,[100] and thus, a determination whether a party has unclean hands might be a suitable question for an advisory jury. Courts have held, however, that once litigants have consented — either expressly or implicitly[101] — to a nonadvisory jury, the court must provide them advance

---

[99]Thomas v. McNair, 882 S.W.2d 870, 880 (Tex. App. 1994, no writ).

[100]Sheila's Shine Prods., Inc. v. Sheila Shine, Inc., 486 F.2d 114, 121-22 (5th Cir. 1973).

[101]The express consent of the parties to a nonadvisory jury is not required by Fed. R. Civ. P. 39(c). If one party demands a jury, the other does not object, and the court orders a jury trial, this will be regarded as trial by consent. Bereda v. Pickering Creek Indus. Park, Inc., 865 F.2d 49, 52 (3d Cir. 1989) (citing C. Wright & A. Miller, 9 Federal Practice & Procedure § 2333(1971)).

notice if it intends to regard the verdict as advisory.[102]  In the absence of such an advance notice requirement, "[a]ll jury verdicts in cases not triable by right by a jury would effectively be advisory, as the district judge could always rule that the verdict was advisory if the judge did not agree with the jury's verdict."[103] In the instant case, the possibility that the jury's findings might be advisory was never mentioned until after the verdict was returned.  Accordingly, "whether or not the issues were equitable in nature, the verdict of the jury must be treated as if the right had existed and it is beyond the power of the district court to set the verdict aside on the theory it was advisory."[104]

Nevertheless, we are satisfied that the jury's finding of unclean hands with regard to DSC is not supported by the evidence. The district court defined "unclean hands" as follows:

> The doctrine of unclean hands is an equitable defense which provides that a party must have acted fairly and justly in its dealings with another in order to assert a cause of action against that party.  A party is said to possess "unclean hands" if it is guilty of conduct involving fraud or bad faith.  If you find that either party acted in a fraudulent, underhanded, unfair or unjust manner then you may conclude that party had "unclean hands."

---

[102]Thompson v. Parkes, 963 F.2d 885, 888 (6th Cir. 1992) ("Clearly the rule requires that the court's initiative in ordering a trial to an advisory jury must occur, and parties must be made aware of it, before case is submitted."); Bereda, 865 F.2d at 53 (holding that "when the litigants have consented to a nonadvisory jury under Rule 39(c), a district court must notify both sides of a jury's advisory status no later than the time at which the jury selection has begun.").

[103]Bereda, 865 F.2d at 52.

[104]Thompson, 963 at 888.

DGI points to several acts of DSC's which it contends constitute unclean hands. First, DGI notes that DSC installed software designed to prevent the operation of DGI's competing microprocessor card. Second, DSC threatened to void switch owners' warranties and maintenance agreements if non-certified cards were used in the switches. Finally, DSC refused to certify DGI cards.

We are persuaded nonetheless that the jury was unreasonable in finding, on the basis of the record evidence, that DSC had unclean hands in its efforts to protect its trade secrets. DSC was under no obligation to certify third party products for use in its switches. Neither was it required to offer warranties for products over whose quality it had no control. And, DSC's letter to its customers informed or reminded them of that policy before DGI's products were ever available for sale. Thus, the only evidence to support the jury's finding of unclean hands was DSC's attempt to install a software patch that disabled DGI's cards. But this evidence also shows that (1) the patch was never effective in disabling the DGI products, (2) the complexity of the switches and the potential problems involved with the introduction of an untested component into those switches provided DSC a valid business justification for the development of the patch, and (3) DSC stopped threatening or attempting to develop such a patch within a year and a half. As such, there seems to be no substantial evidence of bad acts to support a finding of unclean hands on the part of DSC.

But even assuming arguendo that there was sufficient evidence

for the jury to conclude that DSC had unclean hands, such a finding is not an <u>absolute</u> bar to injunctive relief.[105] To invoke the doctrine, a defendant must show that he was injured by the plaintiff's improper acts.[106] And "[w]here the harm done to the defendant is not serious and can be otherwise corrected, the unclean hands maxim should not be applied."[107] Moreover, "[t]he doctrine cannot be used as a defense if the unlawful or inequitable conduct of the plaintiff is merely collateral to the plaintiff's cause of action."[108]

As previously noted, the software patch was never successful in disabling any DGI products. And, DGI presented no evidence that any customers were actually deterred from buying DGI equipment because of the threat of the patch. Accordingly, DSC's putative unclean hands do not serve as a bar to injunctive relief grounded in trade secret misappropriation. We therefore conclude that, based on DGI's misappropriation of trade secrets, the court was within its discretion in fashioning the equitable relief awarded in

---

[105]<u>Omohundro v. Matthews</u>, 341 S.W.2d 401, 410 (Tex. 1960); <u>First Coppell Bank v. Smith</u>, 742 S.W.2d 454, 464 (Tex. App. Dallas 1987, no writ) ("The doctrine of unclean hands does not operate to repel all sinners from a court of equity."); <u>see also</u> <u>Schenck v. Ebby Halliday Real Estate, Inc.</u>, 803 S.W.2d 361, 367 (Tex. App. 1990, no writ) (in deciding whether equitable remedy of rescission should be available to plaintiffs suing under Texas Deceptive Trade Practices Act, "[plaintiffs'] unclean hands, as determined by the jury, [are] <u>a factor</u>" to be considered) (emphasis added).

[106]<u>Omohundro</u>, 341 S.W.2d at 410.

[107]<u>First Coppell</u>, 742 S.W.2d at 464.

[108]<u>Grohn v. Marquardt</u>, 657 S.W.2d 851, 855 (Tex. App. 1983, writ ref'd n.r.e.).

this case.[109]

D.  DSC's Cross-Appeal

  1.  *DGI's State Law Damages Claims*

The jury found DSC liable for interference with DGI's prospective contracts and for unfair competition.  In its cross-appeal, DSC asserts that DGI failed to present evidence sufficient to support these claims, and that the district court therefore erred in denying DSC's motion for a JML.

To establish a claim for tortious interference with prospective contract or business relationships under Texas law, a plaintiff must show:  "(1) a reasonable probability that the parties would have entered into a contractual relationship, (2) an intentional and malicious act by the defendant that prevented the relationship from occurring, with the purpose of harming the plaintiff, (3) the defendant lacked privilege or justification to do the act, and (4) actual harm or damage resulted from the defendant's interference."[110]  While "[i]t need not be absolutely certain that the prospective contract would have been made but for the interference . . . , it must reasonably appear so, in view of

---

[109]DGI also submits that the misuse doctrine should prevent DSC from obtaining injunctive relief based on its Texas claim of unfair competition by misappropriation.  Because we held this state law claim preempted by federal copyright law, any and all relief awarded by the district court in association with that claim has been vacated, and we need not address DGI's misuse defense in this context.

[110]Exxon Corp. v. Allsup, 808 S.W.2d 648, 659 (Tex. App. 1991, writ denied); see also Leonard Duckworth, Inc. v. Michael L. Field & Co., 516 F.2d 952, 956 (5th Cir. 1975).

all the circumstances."[111]  Malice, in this regard, "is not to be understood in its proper sense of ill will against a person, but in its legal sense, as characterizing an unlawful act, done intentionally without just cause or excuse."[112]

To support its claim, DGI adduced the testimony of representatives of two of its customers, Frontier Communications and Allnet Communications.  Greg Wallace, director of engineering for Frontier, testified that his company had not purchased more DGI equipment because of DSC's policy of not warranting or providing technical support to DSC switch owners who used non-certified equipment.  He stated that the "limited amount of business we have probably done with DGI" resulted from this perceived risk.  When asked if Frontier bought fewer products from DGI than it would have liked to, Wallace responded, "I think so, yes."  Joe Buckman, a purchasing manager for Allnet, testified that DSC's policy of canceling the warranties and maintenance agreements of customers who used non-certified products "made Allnet very circumspect about buying the DGI product."  He further recalled that "there were at least two incidents where, in trying to formulate a decision whether to buy a DSC product or a DGI product, that letter had an impact that dictated we buy the DSC product as opposed to the DGI product."

DSC maintains that, as a matter of law, this testimony is too vague to support a claim for interference with prospective

---

[111]Exxon, 808 S.W.2d at 659.

[112]Id.

53

contracts. It notes that, whereas Buckman stated that DSC's letter made Allnet "circumspect" about buying from DGI, there was no evidence that Allnet was actually negotiating with DGI or had received any sort of proposal from DGI; indeed, DGI produced no evidence of any specific proposed contract with Allnet that was lost or of what profits DGI would have earned under such a contract but for DSC's interference. DSC insists that Buckman's and Wallace's testimony that Allnet and Frontier would have purchased more products from DGI had DSC not refused to certify and warrant switches containing DGI cards also fails to support the tortious interference claim, as neither official could relate which products would have been purchased or for what price. Furthermore, DSC submits that DGI's proof of damages is legally insufficient, noting that (1) the proof is based on generic lost profits and not the profits lost from any specific contract, and (2) DGI provided the jury no basis to measure the profit DGI might have made from legal, as opposed to illegal, conduct. Finally, DSC urges that even if it interfered with any prospective DGI contracts, DGI should not be able to recover, as those contracts would only have been possible because of DGI's illegal development efforts: "[I]nterference with an affirmatively illegal act is not a tort for which damages may be recovered because it does not impinge upon any legally protected interest. The law affords no compensation to a wrongdoer for interference with his illegal gain."[113]

---

[113]Guaranty Bank v. National Sur. Corp., 508 S.W.2d 928, 933 (Tex. Civ. App. 1974, writ ref'd n.r.e.).

54

DGI, of course, takes the opposite position, i.e., that the evidence of interference was legally sufficient. It disputes DSC's contention that DGI did not prove the prospective contracts with specificity, pointing out that Texas law requires only that the contract or business relations appear reasonably probable in light of all the circumstances.[114] It posits that the testimony of Wallace and Buckman showed such a probability, and that it did not need to provide proof of particular proposals, price schedules, or the like. DGI also maintains that it was not required to prove its lost profits from DSC's interference with absolute certainty;[115] instead, evidence "may be introduced to show a business' decreased profitability based upon objective facts, figures, and data . . . ."[116]

Our review of the record convinces us that DGI simply did not adduce sufficient evidence to support the jury's verdict on this claim. We recognize that Texas law does not require a great deal of specificity with respect to prospective business relations. The testimony of Wallace and Buckman, however, fails as a matter of law to satisfy even the reasonable probability standard. Statements that a potential customer was "circumspect" about buying DGI products — without any evidence of the type, amount, or price of those products — is too vague to form the basis of a successful

---

[114]Leonard Duckworth, 516 F.2d at 956.

[115]See Sandare Chem. Co. v. Wako Int'l, Inc., 820 S.W.2d 21, 23-24 (Tex. App. 1991, no writ).

[116]Gonzales v. Gutierrez, 694 S.W.2d 384, 390 (Tex. App. 1985, no writ).

tortious interference claim. Furthermore, DGI's proof of damages is wholly speculative. It relies entirely on testimony from Frontier and Allnet, providing absolutely no evidence of its own regarding the profits it would have earned from business relations with these companies. Rather, DGI depends solely on estimated future profits extrapolated from the growth curve of a company that, as we have already shown, was not proven to be closely comparable to DGI. DGI's unitary proof of damages made no attempt to separate the damages from its alleged antitrust and state law claims. Likewise, DGI made no effort to show the quantum of damages resulting from DSC's and DGI's lawful, as opposed to unlawful, actions.

We do not overturn the findings of a jury lightly. Nonetheless, based on the evidence presented at trial — or the lack thereof — we conclude that the district court erred in denying DSC's motion for a JML on DGI's claim for tortious interference with prospective business relations. As DGI's allegations of DSC's tortious interference were also the underpinnings of its unfair competition claim, that too fails as a matter of law. Consequently, we reverse those portions of the district court's order that denied DSC's motion for a JML and awarded damages in favor of DGI.

2. *The Extension of the Injunction*

DSC implores us to expand the district court's injunction to cover not only DGI's microprocessor card, but every DGI card, including its DTI, BT, PCMI, and DTD cards. In support of its

request, DSC emphasizes that, when a defendant unlawfully appropriates another's time, labor, skill, and money, the defendant should be denied all benefits of the misappropriation.[117] In light of our holding that DSC's state law unfair competition by misappropriation claim is preempted, we stress that any and all relief awarded by the district court in association with that claim is vacated. Consequently, we conclude, DSC's request for an expansion of the district court's injunction based on its preempted state claim has been rendered moot.

III

CONCLUSION

For the foregoing reasons, we affirm the district court's grant of a JML in favor of DSC, dismissing DGI's antitrust claim. We also affirm the jury's determination that damages are due to DSC on its claim of misappropriation of trade secrets, and the district court's injunction against DGI, based in part on this claim. Because DSC misused its copyrights, however, we reverse the portions of the injunction tailored by the district court as relief from DGI's copyright infringement. Concluding that DSC's state law claim of unfair competition by misappropriation is preempted, we also reverse the district court's denial of a JML in favor of DGI on this issue, and vacate all legal and equitable relief awarded to DSC for this claim, including the portion of the damage award attributable thereto. Because the monetary damages award to DSC was not sufficiently itemized to permit us to modify the district

---

[117]See Johnny Stewart Game Calls, 865 S.W.2d at 219-20.

court's judgment and render a modified judgment, we remand for that court to do so, taking into account the elimination of state unfair competition damages.  While on remand, the district court is also instructed to reconsider the scope of the injunction in accordance with this opinion, and revise its injunction if and to the extent the court deems necessary or desirable.  Finally, we reverse the award of damages in favor of DGI on its claims for tortious interference and unfair competition, concluding that these claims are not supported by the evidence.

AFFIRMED in part; REVERSED and VACATED in part; and REMANDED in part.